STATE OF NORTH CAROLINA v. WILLIAM THOMAS SHORE

*No. 62*

(Filed 15 May 1974)

**1. Arrest and Bail § 3— arrest without warrant — reasonable ground**

 Officers acted on reasonable ground and with probable cause when they stopped defendant and his companion and took them to the police station for photographing and fingerprinting, since the officers had been informed by officers in another town that a man

State v. Shore

fitting defendant's description had committed an armed robbery aided and abetted by a man fitting·the description of defendant's companion and that the two robbers had been seen in a vehicle registered to defendant's companion.

2. **Arrest and Bail § 3— warrantless arrest — armed robbery — reasonable belief that defendant will evade arrest**

Armed robbery is a crime of violence, the very nature of which suffices to support a reasonable belief that defendant would evade arrest if not immediately taken into custody; therefore, officers who had reasonable grounds to believe that defendant and his companion had committed an armed robbery lawfully arrested defendant and his companion without a warrant.

3. **Criminal Law § 66— in-court identification — observation at crime scene as basis**

The trial court in an armed robbery case did not err in admitting an in-court identification of defendant by two eyewitnesses where the evidence tended to show that one witness gave a detailed description of defendant as one of the robbers, picked defendant's photograph out of a group of eight photographs, and then observed defendant as he was brought alone into a hallway to be observed by the witnesses, while the second eyewitness did not identify defendant from the group of photographs or from the hallway showup, but subsequently made up her mind that defendant was one of the robbers, based on her observation of defendant at the crime scene.

4. **Criminal Law § 60— fingerprint evidence — testimony of officer who lifted prints**

The trial court did not err in admitting testimony of an officer that he had lifted latent fingerprints from an adding machine at the crime scene, though the officer had not been qualified as an expert, since the officer's testimony indicated that he had been lifting prints for ten years and was well qualified to perform that procedure and since the officer made no attempt to express an opinion with respect to the prints.

5. **Criminal Law § 60— fingerprint evidence — chain of custody of evidence**

The trial court did not err in allowing an expert witness to testify that latent fingerprints lifted by an officer from the crime scene and fingerprints of defendant on a fingerprint card were the same since there was no breach in the chain of custody of the evidence as indicated by testimony that the officer who lifted the prints personally mailed them together with a fingerprint card of defendant's prints to the SBI in Raleigh, the envelope containing these was received unopened by the witness, he opened the envelope, ran tests on the two sets of prints, and concluded that they were made by the same person.

6. **Criminal Law § 118— alibi — formal instruction not required**

Although the trial court did not use the word "alibi" in its charge or recapitulation of the evidence, the court did make it quite clear that the burden was on the State to prove all essential elements of the crime charged and that defendant did not have to prove anything in

order to be found not guilty; therefore, the charge afforded defendant the same benefits a formal charge on alibi would have afforded.

PURSUANT to G.S. 7A-30(1) defendant appeals from decision of the Court of Appeals upholding judgment of *Falls, J.,* 16 July 1973 Session, CATAWBA Superior Court.

Defendant was tried upon three separate bills of indictment, proper in form, each charging him with armed robbery on 7 June 1973.

The State's evidence tends to show that on 7 June 1973 Steven Clark was employed as office manager of Capitol Credit Plan, Inc., located at 258 First Avenue, N.W. in Hickory. Other employees working in the office that day were Mrs. Carol Austin and Wayne Hildebran. At approximately 9:50 a.m. two Negro males entered the office. One walked to the center of the room while the larger of the two approached the counter and said he wanted to apply for a loan. While Mrs. Austin prepared to take the application, Steven Clark went to his parked car and returned with a briefcase. When he went to the booth where the applicant was sitting, a pistol was shoved in his face and he was told "to be cool and do like he was told and nobody would get hurt."

Wayne Hildebran and Carol Austin were taken to a back room by the smaller robber and forced to lie face down on the floor. Hildebran's hands were tied behind his back with his own necktie. Steven Clark was then taken into the same room, required to lie face down on the floor, and his hands were also tied behind his back with his necktie. One of the robbers then tied Hildebran's feet with an extension cord. The larger robber carried an adding machine from a table across the room, placed it beside Steven Clark on the floor and tied Clark's feet with the cord that was attached to the adding machine. Clark's wallet containing $14.00 was taken from his person and $37.00 in cash was taken from Wayne Hildebran. Mrs. Austin, with a gun in her back, was then taken to the front office where she put over $1300 in a small bank bag and handed it to the shorter robber. She was returned to the back room and required to remove her panty hose which the robbers used to tie her hands and feet behind her back. After warning the victims not to move, the robbers fled the scene with their loot. All told, they were in the office for five to seven minutes.

Steven Clark worked his arms loose within a minute and the police were called. When the police arrived, Clark told them the robbers were two black males, one about five feet ten or eleven inches in height, weighing 220 pounds, with muttonchops and a small goatee, wearing khaki trousers, brown shirt and work boots; and the other, five feet six or eight inches in height, weighing about 160 pounds, with muttonchops and possibly a mustache, wearing work clothing and a golf-type hat. The larger one had very broad shoulders and both were armed.

At about 9:40 a.m., 7 June 1973, James H. Edwards observed two Negro men walking down First Avenue, N.W. in Hickory. Due to their suspicious actions, he got in his car, circled the block, and observed them as they entered a car parked on First Avenue, N.W. behind the old Belk or Penney Building. It was a 1973 Chevrolet, yellowish-gold, North Carolina license number AEL542. "The tall one" got under the wheel, drove the car from the parking space and followed Mr. Edwards down the street for several blocks before departing in a different direction. Mr. Edwards went directly to the police department where he furnished a description of the men, the car and the license number. Later that morning, after Mr. Clark reported that a robbery had been committed by two men fitting the same description as given by Mr. Edwards, the Hickory Police checked with the Motor Vehicles Department and ascertained that the vehicle in question was registered in the name of William Gallaway, 5129 Britt Drive, Winston-Salem. This information was relayed by radio to the Winston-Salem Police Department together with a description of the men and the car and the fact that a robbery had been committed in Hickory by robbers using that car.

About 2:30 p.m. on 7 June 1973, after receiving the radio message from Hickory, two Winston-Salem officers went to 5129 Britt Drive where they observed a 1973 Chevrolet, North Carolina license number AEL542, parked in the driveway. The officers staked out the place and shortly thereafter two subjects rode up on a motorcycle. They stopped the bike, got off and went into the house. Then both of them came out, got back on the motorcycle and proceeded down Britt Drive toward Cherry Street. The officers stopped the motorcycle and ascertained from the driver's operator's license that he was William Gallaway. Defendant William Thomas Shore was the passenger. Gallaway gave his address as 5129 Britt Drive, the same house

where the 1973 Chevrolet was parked. Upon request of the officers, William Gallaway and defendant William Thomas Shore accompanied them to the police station, the officers in their patrol car and Gallaway and defendant on the motorcycle.

At the police station both Gallaway and Shore were fingerprinted and Shore was photographed. The officers from Hickory arrived later that day and returned defendant to Hickory. Gallaway, who gave the Winston-Salem police permission to search his residence, was taken to his residence where he escaped from the officers. The officers found a .22 caliber revolver, a pair of khaki pants, a pair of brown work shoes, and a golf-type cap, which they seized.

On the afternoon of the robbery, Steven Clark viewed eleven photographs at the Hickory Police Department and picked Gallaway's photograph as one of the robbers. He left Hickory that day around 4:30 p.m. and, upon his arrival at the Winston-Salem Police Department, viewed a group of eight additional photographs from which he picked defendant's picture as the man who stuck the gun in his face that morning.

Mrs. Carol Austin viewed the eight photographs at the Winston-Salem Police Department but did not select anybody. She also saw defendant Shore in the hall at the station but did not identify him as one of the robbers at that time. However, on the return trip to Hickory she "made up her mind" that defendant Shore was one of the robbers. She so testified, adding: "I thought about it a long time." She picked the shorter man (Gallaway) from the eleven photographs exhibited to her in Hickory. She said on voir dire: "I was sure about Gallaway."

Harold Wayne Hildebran testified that he was unable to identify defendant Shore either from the eight photographs he viewed in Winston-Salem or from viewing defendant personally.

James H. Edwards identified defendant Shore as one of the men he saw walking on First Avenue, N.W. in Hickory, and saw entering the 1973 Chevrolet bearing North Carolina license number AEL542 at approximately 9:40 a.m. on 7 June 1973.

On 7 June 1973 O. M. McQuire, Captain of the Detective Division, Hickory Police Department, lifted three or four latent fingerprints from the adding machine found in the back room

at the office of Capitol Credit Plan and placed them on a sheet of Capitol Credit Plan letterhead paper. Detective L. D. Morrison with the Hickory Police Department inked defendant's fingerprints onto a fingerprint card, with defendant's consent, on 7 June 1973. The sheet of paper bearing the latent lifts from the adding machine (State's Exhibit 10) and the fingerprint card containing defendant's inked fingerprints (State's Exhibit 11) were mailed to the State Bureau of Investigation in Raleigh by Captain McQuire personally on 8 June 1973 in a sealed envelope properly addressed and bearing correct postage.

Steven R. Jones, Supervisor of the Identification Section of the State Bureau of Investigation, received State's Exhibits 10 and 11 on 11 June 1973 by first class mail. He personally opened the envelope containing them and compared the latent fingerprints with defendant's known inked impressions. Comparison of the latent prints with the inked impression of defendant's right thumbprint revealed more than twelve points of identification. Based on such comparison it was Mr. Jones' opinion that defendant's right thumb made the two latent thumbprints on State's Exhibit 10.

Approximately ten days prior to 7 June 1973 defendant William Thomas Shore and William Gallaway each traded for a new motorcycle at Town and Country Honda in Winston-Salem. Since considerable custom work had to be done on the new motorcycles, they were not delivered at that time. Between 10 and 11 a.m. on 7 June 1973, Gallaway called Town and Country Honda concerning delivery of the motorcycles previously purchased and was informed they would be ready for delivery at 2 p.m. that day. Shore and Gallaway arrived at Town and Country Honda around 1:30 p.m. on 7 June 1973, and each completed his purchase. Shore paid $849 in cash for the difference in his trade, and Gallaway paid $999 in cash for the difference in his trade.

The in-court identifications of defendant by Steven Clark and Mrs. Carol Austin were admitted over defendant's objection. The court conducted a voir dire, made findings of fact, and concluded that their in-court identifications of defendant were independent in origin and not tainted by any outside confrontation.

As a witness in his own behalf, defendant testified that he was twenty-one years of age, six feet, one and one-half inches

tall, and weighed 225 pounds on 7 June 1973; that on the date of this robbery he had a goatee around the edge of his chin, a light moustache and sideburns; that he did not participate in the armed robbery for which he stands accused and was not in Hickory on that date until taken there late in the evening by the officers. He stated that he was at home until noon on 7 June 1973, and that he telephoned Town and Country Honda about 10 or 10:15 a.m. from his home in Winston-Salem to make sure the motorcycles were ready. About 11 a.m. William Gallaway came to defendant's home and the two of them left to go to the Honda place, arriving there about 11:30 a.m. The trades were completed and defendant testified he paid the difference of $849 with money he got from his father.

Gary Shore, defendant's brother, testified he went to defendant's home at 9:15 a.m. on 7 June 1973 to borrow some tape and left about 10:30 a.m.; that defendant was at home at that time.

Roswell Howard Shore, defendant's wife, testified that on the morning of 7 June 1973 defendant was at home with her until he left the house around 11 or 11:15 a.m.

William B. Shore, defendant's father, testified that he loaned defendant $800 "a day or two before June 7" and told him he could get more if he needed it. Mr. Shore said he had worked for Reynolds Tobacco Company for twenty-eight years and part-time at Baptist Hospital for fifteen and a half years averaging $10,000 to $20,000 a year; that he had approximately $15,000 in the Credit Union and could get money when he needed it.

The jury convicted defendant of armed robbery in all three cases. From judgments pronounced defendant appealed to the Court of Appeals. That court upheld the judgments, 20 N.C. App. 510, and defendant appealed to this Court allegedly as of right under G.S. 7A-30(1), asserting involvement of substantial constitutional questions. Errors assigned are discussed in the opinion.

*Robert Morgan, Attorney General; Charles R. Hassel, Jr., Associate Attorney, for the State of North Carolina.*

*John F. Morrow of Wilson and Morrow, attorney for defendant appellant.*

HUSKINS, Justice.

Defendant contends that his photograph and fingerprints were taken by the Winston-Salem Police while he was illegally detained. He argues therefore that admission of identification evidence based on his photograph and fingerprints violated his constitutional rights and constitutes prejudicial error. His first assignment of error is based on this contention.

G.S. 15-41 in pertinent part provides: "A peace officer may without warrant arrest a person: . . . (2) When the officer has reasonable ground to believe that the person to be arrested has committed a felony and will evade arrest if not immediately taken into custody." It is not required that a felony be shown actually to have been committed. It is only necessary that the officer have reasonable ground to believe that such an offense has been committed. *State v. Mobley,* 240 N.C. 476, 83 S.E. 2d 100 (1954). The terms "reasonable ground" as used in the foregoing statute and "probable cause" as used in the Fourth Amendment to the Federal Constitution are substantial equivalents having virtually the same meaning. *Draper v. United States,* 358 U.S. 307, 3 L.Ed. 2d 327, 79 S.Ct. 329 (1959). A warrantless arrest is based upon probable cause if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon. *McCray v. Illinois,* 386 U.S. 300, 18 L.Ed. 2d 62, 87 S.Ct. 1056 (1967). "Probable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. . . . To establish probable cause the evidence need not amount to proof of guilt, or even to prima facie evidence of guilt, but it must be such as would actuate a reasonable man acting in good faith." 5 Am. Jur. 2d, Arrest § 44 (1962) ; *State v. Harris,* 279 N.C. 307, 182 S.E. 2d 364 (1971).

[1, 2] In *State v. Roberts,* 276 N.C. 98, 171 S.E. 2d 440 (1970), we said that reasonable ground for belief "may be based upon information given to the officer by another, the source of such information being reasonably reliable." Here, the Winston-Salem Police had been informed by the Hickory Police that a man fitting defendant's description had committed an armed robbery in Hickory aided and abetted by a man fitting the description of William Gallaway; that the two robbers had been seen in a Chevrolet automobile bearing North Carolina license

number AEL542, a car registered in the name of William Gallaway. The Winston-Salem officers had been furnished a description of the robbers, including their estimated height and weight, their clothing and color. When defendant was first seen by the Winston-Salem officers he was on a motorcycle with William Gallaway and stopped at Gallaway's address where the car described by the Hickory Police was parked. Both men fitted the description of the men sought in connection with the armed robbery in Hickory. Manifestly, the totality of these facts and circumstances would warrant a prudent man in believing that the felony of armed robbery had been committed in Hickory and that defendant had participated in the commission of that crime. Thus the officers acted on reasonable ground and with probable cause when they stopped Gallaway and this defendant and took them to the police station for photographing and fingerprinting. *State v. Alexander,* 279 N.C. 527, 184 S.E. 2d 274 (1971) ; *State v. Harris, supra; State v. Roberts, supra.* Armed robbery is a crime of violence, the very nature of which suffices to support a reasonable belief that defendant would evade arrest if not immediately taken into custody. *State v. Alexander, supra.*

While there is no absolute test to ascertain exactly when an arrest occurs, the time and place of an arrest is determined in the context of the circumstances surrounding it. *State v. Allen,* 282 N.C. 503, 194 S.E. 2d 9 (1973). When the foregoing principles of law are applied to the facts in this case, the exact point in time when defendant was "arrested" is immaterial. The Winston-Salem Police had reasonable grounds under the law to arrest defendant and Gallaway without a warrant at the moment of their initial on-the-street detention. Furthermore, their arrest was constitutionally valid because the officers had probable cause to make it. *State v. Eubanks,* 283 N.C. 556, 196 S.E. 2d 706 (1973). Since defendant's detention at the time he was photographed and fingerprinted was in all respects lawful, his first assignment of error has no merit and is overruled.

Defendant contends his in-court identification by Steven Clark and Carol Austin was based on unnecessarily suggestive pretrial identification procedures which violated due process. He therefore argues that the identification testimony of these witnesses was erroneously admitted.

"The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances

reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice. *Foster v. California*, 394 U.S. 440, 22 L.Ed. 2d 402, 89 S.Ct. 1127; *Stovall v. Denno*, 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967; *Rochin v. California*, 342 U.S. 165, 96 L.Ed. 183, 72 S.Ct. 205; *State v. Haskins*, 278 N.C. 52, 178 S.E. 2d 610; *State v. Austin*, 276 N.C. 391, 172 S.E. 2d 507; *State v. Rogers*, [275 N.C. 411, 168 S.E. 2d 345]." *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974).

In *Simmons v. United States*, 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968), identification by photograph was expressly approved and the Court held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

The *Simmons* test has been applied by this Court in many cases including *State v. Tuggle*, 284 N.C. 515, 201 S.E. 2d 884 (1974); *State v. Lock*, 284 N.C. 182, 200 S.E. 2d 49 (1973); *State v. Morris*, 279 N.C. 477, 183 S.E. 2d 634 (1971); *State v. Jacobs*, 277 N.C. 151, 176 S.E. 2d 744 (1970); *State v. Accor and Moore*, 277 N.C. 65, 175 S.E. 2d 583 (1970).

At defendant's request the trial court conducted a voir dire to determine whether defendant's in-court identification was tainted by prior photographic identification procedures or by any confrontation procedure. The evidence on voir dire reveals that Steven Clark, Carol Austin, and Wayne Hildebran were shown eight photographs at the Winston-Salem Police Station on the afternoon of the robbery. The photographs were placed on a table in two rows of four. Although the record is not entirely clear on this point, each witness apparently viewed the photographs separately. Steven Clark picked the photograph of defendant as one of the men who robbed the Capitol Credit Plan office in Hickory earlier that day. Mr. Clark testified that "there wasn't anything on the photographs to reveal the name of any of the subjects," and that "no one suggested to me that the defendant was in this group of eight photographs." There is no evidence that defendant's photograph was marked in any way to make it conspicuous. There is some evidence that the *quality* of defend-

ant's photograph may have been better than the others, but this alone would not render the procedure impermissibly suggestive. There is nothing in the record to support defendant's contention in that respect. *State v. Knight,* 282 N.C. 220, 192 S.E. 2d 283 (1972).

After Steven Clark and Carol Austin had viewed the eight photographs at the Winston-Salem Police Station, and after Clark had picked defendant's photograph as one of the robbers while Mrs. Austin had failed to make any selection, the officers brought defendant and Gallaway singly into the hallway to be viewed by the witnesses. Defendant contends this hallway showup was impermissibly suggestive and a violation of due process. The record discloses, however, that the State offered no evidence of this hallway showup in the presence of the jury. Our inquiry therefore is not whether evidence of the showup would be admissible but whether the in-court identification by these witnesses was tainted by the confrontation in the hallway.

Although the practice of showing suspects singly for identification purposes has been recognized as suggestive and widely condemned, whether such a confrontation violates due process depends upon the totality of the circumstances. *Neil v. Biggers,* 409 U.S. 188, 34 L.Ed. 2d 401, 93 S.Ct. 375 (1972); *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967 (1967); *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974). In the *Biggers* case the United States Supreme Court considered the scope of due process protection against the admission of evidence deriving from suggestive identification procedures and held that even if a pretrial confrontation procedure was suggestive there is no violation of due process if examination of the total circumstances indicates the identification was reliable. The factors set out by the Court to be considered in evaluating the likelihood of misidentification are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

Here, the record discloses that Steven Clark observed defendant at the Capitol Credit Plan office for a period of five to seven minutes. He supplied the officers with a detailed description of the two men who robbed the office and one description fit defendant very closely. Mr. Clark was certain that he "will

never forget his face or his body build" and the witness never wavered in his identification of defendant. The time lapse between the crime and the confrontation in question was only nine hours and occurred shortly after Mr. Clark had picked defendant's photograph from the eight photographs shown him by the police.

Mrs. Carol Austin testified on voir dire that defendant was one of the men who committed the robbery and that she recognized him "from seeing him in our office on the 7th of June . . . not tainted by seeing any photograph or seeing him anywhere else." The record discloses that after viewing the eight photographs at the Winston-Salem Police Station she made no photographic identification. After seeing defendant in person in the hallway at the police station in Winston-Salem, she still made no identification. Explaining the basis for her in-court identification, she said: "I interviewed him [defendant] face to face concerning the loan. . . . I do not think that my being able to see him even though I could not identify him at that time has helped me make up my mind. I made up my mind when we were coming back from Winston-Salem. No one talked to me about making up my mind. I thought about it a long time." She had already identified Gallaway from the eleven photographs exhibited to her in Hickory.

[3] The trial court found and concluded "that the in-court identification of this defendant by the witnesses Clark and Mrs. Austin . . . is not tainted by any outside confrontation but was based upon the identification during the course of the alleged robbery." Since this finding is supported by competent evidence, it alone renders the in-court identification competent even if it be conceded *arguendo* that the showup procedure was improper. *State v. Haskins,* 278 N.C. 52, 178 S.E. 2d 610 (1971) ; *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968) ; see *Coleman v. Alabama,* 399 U.S. 1, 26 L.Ed. 2d 387, 90 S.Ct. 1999 (1970). The finding, supported by competent evidence, is conclusive on appeal and must be upheld. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974). The failure of Mrs. Austin to identify defendant from the photographs and her failure to identify him during the brief hallway showup goes to the weight rather than the competency of her in-court identification.

The totality of the circumstances indicates that the identification was reliable and hence no violation of due process was committed. Defendant's objections to the in-court identification

testimony of Steven Clark and Carol Austin were properly over-ruled.

[4]  Over defendant's objection the trial court permitted Captain O. M. McQuire of the Hickory Police Department to testify concerning the "lifting" of latent fingerprints from an adding machine in the Capitol Credit Plan office. Defendant asserts, and correctly so, that Captain McQuire had not been qualified as an expert. On that ground defendant assigns as error the admission of Captain McQuire's testimony.

Defendant cites no authority, and we are unaware of any, that only "experts" may "lift" fingerprints and then testify that the latent prints had been lifted from some surface or object at the scene of the crime. Admittedly, a person who lifts latent prints must know how to perform that procedure. But this does not mean he must be qualified as an "expert." The basic reason for qualifying a witness as an expert is to insure that he is better qualified than the jury to form an opinion and draw appropriate inferences from a given set of facts. 1 Stansbury's North Carolina Evidence § 132 (Brandis rev. 1973).

Here, Captain McQuire's testimony indicates that he had been lifting latent fingerprints for a period of ten years and was well qualified to perform that procedure. He made no attempt to express an opinion and was asked no questions requiring him to do so. This assignment of error is totally without merit.

[5]  Defendant further contends that the trial judge committed prejudicial error in allowing Stephen R. Jones to testify that he compared the latent fingerprints lifted by Captain McQuire (State's Exhibit 10) with the fingerprints of defendant on the fingerprint card (State's Exhibit 11). Defendant does not challenge Jones as an expert witness but argues that the State failed to lay a proper foundation for his testimony in that it failed to show a proper "chain of custody" of the two exhibits.

The evidence on this question shows that Captain McQuire lifted the latent prints from an adding machine in the Capitol Credit Plan office, placed them on a sheet of letterhead paper from Capitol Credit and on 8 June 1973 personally mailed this sheet of paper together with a fingerprint card containing defendant's fingerprints to the State Bureau of Investigation in Raleigh. The envelope containing these two exhibits was received unopened by Stephen R. Jones when his secretary carried

the envelope from the SBI mailroom to his desk. Jones then opened the envelope, ran the comparison tests on State's Exhibits 10 and 11, and concluded that the latent prints on the letterhead stationery and defendant's right thumbprint on the fingerprint card were made by the same thumb. At trial, Captain McQuire identified Exhibit 10 as the letterhead paper on which he placed the latent prints, and Detective Morrison testified that Exhibit 11 was the fingerprint card containing defendant's fingerprints. We see no breach in the chain of custody from this evidence. It all points unerringly to the conclusion that the latent prints examined by Stephen R. Jones were the latent prints lifted from the adding machine by Captain McQuire and that the fingerprints on the fingerprint card were those of defendant. This assignment has no merit and is overruled.

Finally, defendant assigns as error the failure of the trial court to instruct the jury as to the legal principles applicable in its consideration of defendant's alibi evidence.

Prior to decision of this Court in *State v. Hunt*, 283 N.C. 617, 197 S.E. 2d 513 (filed 12 July 1973), a defendant who offered alibi evidence was entitled to such instruction without specifically requesting it. *State v. Vance*, 277 N.C. 345, 177 S.E. 2d 389 (1970); *State v. Leach*, 263 N.C. 242, 139 S.E. 2d 257 (1964); *State v. Gammons*, 258 N.C. 522, 128 S.E. 2d 860 (1963); *State v. Spencer*, 256 N.C. 487, 124 S.E. 2d 175 (1962).

In *State v. Hunt, supra,* we held "that reason and authority support a different rule, namely, that the court *is not required* to give such an instruction unless it is requested by the defendant. Hence, the cited decisions, in respect of the rule stated above, are overruled. The rule stated herein will be applicable in trials commenced after the filing of this opinion. . . . " The opinion in *Hunt* was filed 12 July 1973. The trial of this case commenced on 17 July 1973. Defendant concedes he made no request for an instruction on alibi but contends, nevertheless, that since the decision in *Hunt* had not been published at the commencement of his trial he may not be charged with knowledge of the change in the rule.

Prior to the filing of our decision in the *Hunt* case, a defendant offering evidence of alibi was entitled, *without request,* to a charge substantially as follows: "An accused, who relies on an alibi, does not have the burden of proving it. It is incumbent upon the State to satisfy the jury beyond a reasonable doubt on

the whole evidence that such accused is guilty. If the evidence of alibi, in connection with all the other testimony in the case, leaves the jury with a reasonable doubt of the guilt of the accused, the State fails to carry the burden of proof imposed upon it by law, and the accused is entitled to an acquittal." *State v. Minton,* 234 N.C. 716, 68 S.E. 2d 844 (1952) ; *State v. Spencer, supra.*

Portions of the charge in this case pertinent to alibi are as follows:

"The defendant has entered pleas of not guilty to any and all of these three charges of armed robbery. The fact that he has been indicted is no evidence of his guilt. Under our system of justice once a defendant such as this defendant pleads not guilty *he is not required to prove his innocence,* he is presumed to be innocent. The State must prove to you that the defendant in these cases is guilty beyond a reasonable doubt. (Emphasis added.)

\* \* \*

"The defendant does not have the burden of proof or establishing his innocence as I told you awhile ago, *he does not have to prove anything. The burden is on the State from the beginning to the end of the case.* Nevertheless the defendant offered evidence in his own behalf and by members of his family. (Emphasis added.)

\* \* \*

" . . . [T]he defendant testified to the effect that he was not in Hickory at all and therefore he could not be the person or one of the persons that robbed the Capitol Credit Plan and the employees of their money; that he was in Winston-Salem and until he was brought back to Hickory that he had never been in Hickory in his life.

\* \* \*

" . . . [A]nd he was corroborated in that he didn't leave Winston-Salem on the 7th of June by his wife who testified that he did not leave the apartment or the house where they lived except to make a phone call in or around 11:30 or 12:00 that day; that his brother testified that he went to his apartment or his house on the morning of June 7th, about ten and was there until 10:30 and that the defendant was there and did not leave while he was there . . . . "

Then in the final mandate to the jury in each of the three cases the court instructed the jury that in order to convict defendant of armed robbery the State must prove beyond a reasonable doubt (1) that defendant Shore either alone or with another took the money alleged in the bill of indictment, (2) carried it away, (3) without the consent of the victim, (4) with intent to deprive the victim of the use of the money permanently, (5) knowing he was not entitled to take the money, (6) having a firearm in his possession at the time of the taking, and (7) obtained the money by endangering or threatening the life of the employees Clark, Hildebran and Mrs. Austin. The court then charged the jury:

> "If you do not so find or have a reasonable doubt about either one or more of these seven essential elements which I just outlined for you, it would be your duty to return a verdict of not guilty as to that charge or if upon a fair and impartial consideration of *all the facts and circumstances in the case,* you have a reasonable doubt as to the defendant's guilt of that crime, it would be your duty to give him the benefit of such doubt and to find him not guilty." (Emphasis added.)

[6] It thus appears that the trial judge made it quite clear that the burden was on the State to prove all essential elements of the crime charged and that defendant did not have to prove anything in order to be found not guilty. Although the word "alibi" was not mentioned in the charge or in the recapitulation of the evidence, the charge given afforded defendant the same benefits a formal charge on alibi would have afforded. We perceive no prejudice to defendant. "This Court has repeatedly held that in order to obtain an award for a new trial on appeal for error committed in a trial of the lower court, the appellant must show error positive and tangible, that has affected his rights substantially and not merely theoretically, and that a different result would have likely ensued." *State v. Cogdale,* 227 N.C. 59, 40 S.E. 2d 467 (1946) ; *accord, State v. Cross,* 284 N.C. 174, 200 S.E. 2d 27 (1973). Insubstantial technical errors which could not have affected the result will not be held prejudicial. *State v. McWilliams,* 277 N.C. 680, 178 S.E. 2d 476 (1971). This assignment is overruled.

Defendant having failed to show prejudicial error the verdict and judgment in each case must be upheld.

No error.