STATE OF NORTH CAROLINA v. JEFFREY BRIAN MEDLIN

No. 76A92

(Filed 12 February 1993)

1. **Arrest and Bail § 69 (NCI4th) — warrantless arrest — probable cause**

   A homicide defendant's arrest was made with probable cause and the trial court did not err in denying suppression of defendant's statements and the evidentiary fruits of those statements where a homicide and robbery were committed at a restaurant in Wake County; Wake County officers determined in the early hours of the investigation that defendant had previously worked in the restaurant where the robbery and murder occurred; defendant had knowledge of the unique location of the money taken; was personally known to the victim; was a resident of the area; was a recently released robber; Wake County officers, after speaking with Atlantic Beach officers, were aware that defendant was in possession of a large amount of cash, both small bills and quarters; Atlantic Beach officers were aware of the above information; defendant told Atlantic Beach officers that the quarters were for amusement games and that he had left Zebulon in Wake County at about 4:00 a.m. that morning; the Atlantic Beach police officers discovered independently that defendant had paid a motel bill in cash with small bills; and Atlantic Beach officers were aware that defendant had attempted to exchange small bills for larger ones with the hotel clerk and later at a bank had exchanged small bills which the teller said smelled like food. This information was sufficient to warrant a cautious man in believing the accused to be guilty.

   **Am Jur 2d, Arrest § 44.**

   **What constitutes probable cause for arrest — Supreme Court cases. 28 L. Ed. 2d 978.**

2. **Evidence and Witnesses § 1235 (NCI4th) — incriminating statements — right to counsel — interrogation not custodial**

   There was no custodial interrogation, and the trial court correctly denied defendant's motion to suppress his statements and their evidentiary fruits, where defendant was initially arrested in Atlantic Beach on the understanding that there was

STATE v. MEDLIN

[333 N.C. 280 (1993)]

an outstanding arrest warrant for defendant; after being advised by Wake County officers that there was no warrant for defendant, Chief Duke instructed his officers to tell defendant he was free to leave and personally told defendant that he could leave; Chief Duke informed defendant that Wake County officers were on their way and wanted to talk to him and that defendant was free to go or that he could stay and speak with Wake County officers; defendant was told that he would be free to move around the police station if he stayed; defendant said that he knew a little about what the Wake County officers wanted to talk about and that he wanted to stay and talk with an officer; defendant remained at the station with his money and cigarettes on a table in front of him; a public phone was available to him throughout the time he was at the station; defendant was constantly in the presence of at least one uniformed officer and was escorted by an officer to the rest room; the Atlantic Beach Police Department facility is small and anyone who was there would have been constantly in the presence of police officers; it is unlikely that anyone would have been permitted to wander unmonitored around police headquarters; defendant repeatedly told Atlantic Beach officers that he wanted to go ahead and make a statement, but Chief Duke wanted defendant to talk to Wake County officers since they were more familiar with the case; and Chief Duke and Captain Wrenn agreed to take defendant's statement after numerous requests. The trial court's findings that defendant was told that he was free to go and that he subsequently volunteered to stay and repeatedly sought interviews with the officers are supported by competent and substantial evidence.

**Am Jur 2d, Criminal Law § 788; Evidence § 555.**

**What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

3. **Evidence and Witnesses § 1264 (NCI4th)— right to counsel— waiver**

Assuming that a murder and robbery defendant was in custody and had a right to counsel when he sought to give a statement, he waived that right where, in response to the

STATE v. MEDLIN

[333 N.C. 280 (1993)]

question concerning the desire for counsel, defendant stated, "Yes—I know you can't get one now but I want to talk to you. I'll get a lawyer for my trial"; after the police chief indicated that he would get a telephone book for defendant so that he could look up an attorney, defendant responded, "No, sir, I don't want an attorney"; and when defendant was later asked by a detective whether he wanted a lawyer prior to that questioning, defendant stated and wrote on the *Miranda* form, "Not at this time but when I go to court." Defendant waived his right to counsel during questioning and preserved his right to an attorney at trial. Defendant did not reverse his position, and, as for whether his statement was ambiguous, the police chief was arguably attempting to clarify whether defendant in fact wanted an attorney when he stated that he was not going to personally go out and get an attorney for defendant, but that he would get a telephone so that defendant could find an attorney. It is clear that defendant responded that he did not want an attorney.

**Am Jur 2d, Criminal Law § 797; Evidence § 555.**

4. **Constitutional Law § 277 (NCI4th) — right to counsel — waiver — knowing, intelligent, and voluntary**

A trial court did not err in a murder and robbery prosecution by refusing to suppress defendant's statements on the grounds that his waiver of counsel was not knowing, intelligent, and voluntary. Although defendant contended that his waiver could not have been voluntary because he did not fully understand the nature of the right, defendant was read his *Miranda* rights, which explained that defendant was entitled to counsel during questioning and not just at trial; defendant was no stranger to the process, having been charged and convicted of robbery and having been twice advised and waived his rights in connection therewith; defendant insisted on giving a statement in an attempt to divert suspicion to another individual; numerous officers testified that defendant's faculties seemed in no way impaired; and defendant had cigarettes available to him, took bathroom breaks, was provided with food and drink, and was given the opportunity to see his girlfriend.

**Am Jur 2d, Criminal Law § 797; Evidence § 555.**

5. **Constitutional Law § 262 (NCI4th)— waiver of right to counsel—no violation of N.C. Constitution**

There was no authority for applying Article I, Section 23 of the North Carolina Constitution differently from the pertinent sections of the federal Constitution where defendant's warrantless felony arrest was based on probable cause, defendant was released and was told he could leave and was not thereafter in custody, and defendant was therefore not entitled to the presence of counsel when he made his statements.

**Am Jur 2d, Criminal Law § 797; Evidence § 555.**

Justice FRYE concurring in the result.

Chief Justice EXUM and Justice MITCHELL join in this concurring opinion.

Justice PARKER did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment upon defendant's plea of guilty and conviction of first-degree murder entered by Thompson, J., at the 22 April 1991 Criminal Session of Superior Court, Wake County. Defendant's motion to bypass the Court of Appeals, pursuant to N.C.G.S. § 7A-31, as to his robbery with a dangerous weapon conviction, for which he received a consecutive forty-year sentence following his plea of guilty, was allowed by this Court on 13 March 1992. Heard in the Supreme Court 3 November 1992.

*Lacy H. Thornburg, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On 24 September 1990, defendant, Jeffrey Brian Medlin, was indicted for robbery with a dangerous weapon and the first-degree murder of Darla Cline. On 18 February and 5 March 1991, defendant filed four motions to suppress, seeking to exclude statements made by defendant to law enforcement officials on 11 September 1990

and the resulting physical evidence. A hearing upon defendant's motions to suppress was conducted at the 11 March 1991 Criminal Session of Superior Court, Wake County, before Judge Robert L. Farmer. Upon oral and written denials of the suppression motions, defendant entered pleas of guilty to first-degree murder and to robbery with a dangerous weapon at the 22 April 1991 Criminal Session of Superior Court, Wake County, before Judge Jack A. Thompson. Pursuant to N.C.G.S. § 15A-979(b), defendant reserved his right to appeal from the denial of the suppression motions. Thereafter, a capital sentencing hearing was conducted before a jury, following which the jury recommended a sentence of life imprisonment for the murder. Judge Thompson sentenced defendant to a term of forty years' imprisonment for the robbery with a dangerous weapon conviction and a consecutive term of life imprisonment for the first-degree murder conviction. From those judgments and from the denial of defendant's suppression motions, defendant appealed to this Court.[1]

Defendant brings forward two assignments of error: whether the trial court erred in denying defendant's motions to suppress incriminating statements and their evidentiary fruits (1) because this evidence was obtained as a direct result of an illegal, warrantless arrest; and (2) because the statements were obtained from defendant in violation of his statutory and state and federal constitutional right to counsel. After a thorough review of the motion hearing transcript and sentencing proceeding, the record on appeal, and the briefs of defendant and the State, we conclude that the trial judge properly denied defendant's motions to suppress, and we therefore affirm his convictions and sentences.

At the 11 March 1991 suppression hearing, the State presented evidence that tended to show the following facts and circumstances. Shortly before 5:00 a.m. on 11 September 1990, the body of Darla Cline was found at her place of employment, Johnson's Forks Restaurant, an all-night restaurant near Zebulon, North Carolina. She was found in the kitchen, lying face down in a pool of blood around her upper torso and head area. She had last been seen alive by a newspaper carrier approximately forty-five minutes earlier.

---

1. Defendant's appeal challenges the denial of three of his four suppression motions. Defendant has abandoned his assignment of error to the denial of the motion to suppress the hair and blood samples taken from defendant's person on 22 October 1990.

## STATE v. MEDLIN

[333 N.C. 280 (1993)]

Detective Kenneth E. Duckworth, an investigator with the Wake County Sheriff's Department, determined that Ms. Cline had been beaten about the head and upper body and stabbed in the face and upper chest. An autopsy later revealed that she had been struck in the head six times and stabbed sixteen times. The fatal wound was a stab wound to the throat which severed the jugular vein and from which she would have taken approximately fifteen to twenty minutes to die as a result of exsanguination.

Wake County sheriff's deputies at the scene determined that a cash box, containing $800 to $1,500 in change and paper money in small denominations used for amusement games, was missing from its usual place in the kitchen. The quarters in the box were rolled in orange wrappers and were stamped "AM Amusement." The location of the money box was known only to employees. Later that morning, the Wake County deputies received information from Ike Strickland, a local convenience store operator, that he knew who committed the murder, that it was committed by "Medlin" (defendant), that defendant was a former employee of the restaurant that had been robbed, and that defendant had recently been released from prison following a robbery conviction.

At approximately 2:45 or 3:00 p.m., Detective Duckworth received a telephone call from the Atlantic Beach Police Department concerning a traffic stop that had occurred there. During a consent search of the vehicle, in which defendant was a passenger, the officers found what appeared to be burglary tools on the back floorboard and a Crown Royal bag containing a large amount of quarters and one- and five-dollar bills. The money appeared to be $700.00 or more. Defendant informed the officers that he owned amusement machines, that he had left Zebulon about 4:00 a.m. that day, and that he was staying at the Iron Steamer in Atlantic Beach. The driver, Dana Bylsma, was cited for an expired registration, and they were released. Upon receiving this information, Detective Duckworth informed Atlantic Beach Detective Galizia that a robbery and murder had occurred in Zebulon around 4:00 or 5:00 a.m., that the prime suspect was defendant, and that a large amount of one-dollar bills, five-dollar bills, and quarters was missing. Detective Duckworth told Detective Galizia that there were no outstanding warrants but that he wanted to interview defendant and Bylsma. Detective Duckworth was concerned that money or other evidence might be disposed of before the Wake County officers could make the two-and-a-half to three-hour drive to Atlantic

Beach. Therefore, he requested that the Atlantic Beach Police Department locate defendant and Bylsma and hold them. At 3:45 p.m., Detective Duckworth sent a PIN message to confirm the request, which stated: "Att: Detective Galizia: Please locate Red Datsun, CXX4134. Stop and hold ref: homicide occurred this a.m. this jurisdiction. Authority, Detective Duckworth." Following the receipt of this message, Atlantic Beach police determined that the motel bill had been paid in advance in cash and that both defendant and Bylsma had attempted to exchange small-denomination bills for larger ones with the motel clerk. They also discovered that defendant and Bylsma had exchanged $700.00 in five-dollar bills at a local bank. According to a bank teller, the bills exchanged smelled like food.

Several Atlantic Beach detectives and police officers took up positions at some condominiums next door to the Iron Steamer. From his vantage point at the condominiums, Officer Harris heard, over his walkie-talkie, Chief Duke ask the dispatcher whether a warrant had been issued. The dispatcher's response was "Ten-four." Apparently, the dispatcher misunderstood and in error confirmed the existence of outstanding warrants. As he watched, Officer Harris saw defendant come out of the hallway onto the breezeway, walking fast and looking around. At that moment, Detective Guthrie came around the corner, and Officer Harris called out to him that defendant was the subject they had been seeking. Defendant attempted to flee, and Detective Guthrie drew his weapon and apprehended defendant. Defendant, Bylsma, and Cari Childers (a female in defendant's motel room) were transported to the Atlantic Beach Police Department at approximately 4:30 p.m.

Chief Duke directed the dispatcher to send a PIN message to Wake County that the three people were in custody. Chief Duke requested that copies of the arrest warrants be "faxed" to him and that the Wake County officers come to Atlantic Beach. Afterwards, Chief Duke learned from Detective Galizia that no warrants were on file. Chief Duke then called Detective Duckworth, who confirmed that no warrants existed and that he was in the process of getting them. Following that conversation, Chief Duke told his officers that they were to explain to defendant, Bylsma, and Childers that they were not under arrest and that they were free to leave. He also instructed his officers to inform defendant and the others that police officers were en route from Wake County and would like to talk to them. Before defendant was told that he could go,

Captain Wrenn served him with a citation for resisting, delaying, and obstructing a law enforcement officer. Chief Duke personally told defendant that he was free to go, that there was an investigation underway involving incidents that took place in the Wake County area, that investigators were en route and wanted to talk to him, that he could leave or that he could stay and move around the police department at will, and that if he needed anything, to let them know. Defendant indicated that he wanted to stay. According to Chief Duke's testimony, defendant said that he knew a little about what Wake County wanted to talk to him about and that he would like to talk with an officer. Defendant not only remained at the station, but began actively pursuing local officers in an attempt to give a statement. According to Captain Wrenn, defendant repeatedly said, "I want to talk to you about what happened."

Captain Wrenn and Chief Duke finally agreed to take defendant's statement at about 7:00 p.m. on 11 September 1990. Using a standard *Miranda* warning form, Chief Duke advised defendant of his rights. Defendant responded that he understood each one. When Chief Duke asked if he wanted a lawyer, defendant said, "Yes—I know you can't get one now but I want to talk to you. I'll get a lawyer for my trial." Chief Duke responded to the defendant that he was not personally going to go out and get an attorney for defendant but he would get a telephone book for the defendant so that he could look up an attorney. Defendant replied, "No, sir, I don't want an attorney." Chief Duke then asked defendant if he wanted to talk to them; defendant answered "Yes" and signed the waiver form. Chief Duke terminated the interview with defendant after fifteen minutes because defendant was talking too fast. Chief Duke suggested that defendant might want to make a written statement. Defendant then made a written statement and two tape-recorded statements. Chief Duke called Wake County and spoke to Detective Pearce at about 7:40 p.m. with the information obtained from defendant regarding his participation in the robbery. Detective Pearce prepared an affidavit to that effect, and Detective Duckworth completed drawing the search warrant for defendant's motel room and car. Detective Duckworth then obtained the search warrant and an arrest warrant charging defendant with robbery with a dangerous weapon, which he faxed to Atlantic Beach. Detective Duckworth requested that the Atlantic Beach officers serve only the search warrant.

STATE v. MEDLIN

[333 N.C. 280 (1993)]

Captain Wrenn gave the written statement to Detective Toler, who arrived from Wake County at approximately 9:15 p.m. Before Detective Toler interviewed defendant, he advised him of his rights using a standard *Miranda* form. Defendant stated that he understood his rights. When asked if he wanted a lawyer, defendant stated and wrote on the form, "Not at this time but when I go to court." Defendant responded "Yes" when asked if he wanted to talk now, and then he signed the waiver. Defendant gave Detective Toler substantially the same statement he had earlier given to Captain Wrenn. Defendant stated that Richard Baker, a friend of his, went into Johnson's Forks Restaurant and committed the robbery and murder while defendant waited in the car. Defendant thought that Baker was going into the restaurant to use the bathroom until Baker ran out with the money and blood on his clothes. Detective Toler interviewed defendant until about 12:50 a.m.

At approximately 1:00 a.m. on 12 September 1990, Detective Pearce entered the office alone while defendant was sitting at the desk. Pearce told defendant that defendant was not telling the truth concerning the events of the murder and robbery. Defendant stood up and told Pearce that he had personally killed Darla Cline. Defendant stated that he was relieved to have told what happened. Pearce interviewed defendant for approximately two hours, with breaks at 1:55 and 2:20 a.m. Defendant gave Pearce a detailed statement admitting to robbing and killing Darla Cline by beating her with brass knuckles and stabbing her with a knife. Defendant illustrated his confession by drawing sketches of the restaurant, and he described where he had thrown the knife and brass knuckles. Pearce wrote down what defendant told him and then read the statement to defendant. Defendant then signed the statement. Defendant was taken to the magistrate's office in Carteret County and was served with a robbery warrant, then was transported to Wake County. Defendant was served with an arrest warrant for murder at approximately 2:00 p.m. on 12 September 1990.

On 13 September 1990, defendant made a request to the jail supervisor to see Detective Duckworth. After being advised of his rights and signing a waiver form, defendant made additional statements about the crime to Duckworth. Defendant described the murder weapon and told Duckworth the location where he had thrown it.

STATE v. MEDLIN

[333 N.C. 280 (1993)]

[1] Defendant contends that the trial court erred by denying his motions to suppress the incriminating statements and their evidentiary fruits on the basis that this evidence was obtained by law enforcement officers as a result of his illegal, warrantless arrest without probable cause. We disagree. Based upon evidence introduced at a voir dire hearing, during which numerous Atlantic Beach and Wake County police officers testified, the trial court made findings and concluded that "the Wake County Sheriff's Department investigators had probable cause on September 11, 1990, before the defendant was detained by the Atlantic Beach Police Department officers at the Iron Steamer Motel[,] to believe that the defendant had committed a felony, and thus the detention of the defendant at the Iron Steamer Motel and removal to the Atlantic Beach Police Department was lawful." The trial court's findings that led to this conclusion are supported by substantial evidence and are thus binding on this Court. *State v. Mahaley*, 332 N.C. 583, 423 S.E.2d 58 (1992); *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982). The record indicates that defendant was apprehended in a breezeway outside of his motel room. A warrantless felony arrest is valid if supported by probable cause. N.C.G.S. § 15A-401(b)(2)(a) (1988); *Brinegar v. United States*, 338 U.S. 160, 93 L. Ed. 1879, *reh'g denied*, 338 U.S. 839, 94 L. Ed. 513 (1949); *State v. Zuniga*, 312 N.C. 251, 322 S.E.2d 140, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1984). We have previously held:

> A warrantless arrest is based upon probable cause if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon. "Probable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty."

*State v. Shore*, 285 N.C. 328, 335, 204 S.E.2d 682, 686 (1974) (citations omitted); *quoted in State v. Smith*, 328 N.C. 99, 111-12, 400 S.E.2d 712, 719 (1991); *State v. Zuniga*, 312 N.C. at 259, 322 S.E.2d at 145.

During the early hours of the investigation, Wake County officers determined that defendant, a recently released convicted robber, was a resident of the area, had previously worked in the restaurant, had knowledge of the unique location of the money

**STATE v. MEDLIN**

[333 N.C. 280 (1993)]

that was taken, and was personally known to the victim. After speaking with the Atlantic Beach officers regarding the traffic stop, the Wake County officers were aware that defendant was in possession of a large amount of cash, both small bills and quarters. Defendant told the Atlantic Beach officers that the quarters were for amusement games and that he had left Zebulon at about 4:00 a.m. that morning. In addition to this information, the Atlantic Beach police officers discovered independently that defendant had paid a $108.00 motel bill in cash, with small-denomination bills. Atlantic Beach officers were aware that defendant had attempted to exchange small bills for larger ones with the hotel clerk and later, at a local bank, had exchanged small bills that, according to the bank teller, smelled like food. The Atlantic Beach officers possessed all of the above information at the time of defendant's initial apprehension at the Iron Steamer Inn, and we conclude that this information was sufficient "to warrant a cautious man in believing the accused to be guilty." *Shore*, 285 N.C. at 335, 204 S.E.2d at 686. We conclude that defendant's arrest was made with probable cause. We therefore hold that the trial court did not err in denying suppression of defendant's statements or the evidentiary fruits of those statements, on the basis that defendant's arrest was based upon probable cause. The fact that defendant was later released (and subsequently rearrested) does not affect the validity of the original arrest.

[2] In his remaining assignment of error, defendant contends that the trial court erred by denying defendant's motions to suppress incriminating statements and their evidentiary fruits because the statements were obtained from defendant in violation of his rights under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d 984 (1981); *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, *reh'g denied by California v. Stewart*, 385 U.S. 890, 17 L. Ed. 2d 121 (1966). We disagree. After a careful review of the evidence, we conclude that defendant was not in custody when he gave the statements in question. The rule of *Miranda* requiring that suspects be informed of their constitutional rights before being questioned by the police and the rule of *Edwards* guaranteeing the right to remain silent and the presence of counsel during such questioning apply only to *custodial* interrogation. It is well established that the test for whether a person is "in custody" for *Miranda* purposes

is whether a reasonable person in the suspect's position would feel free to leave at will or feel compelled to stay. *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992); *State v. Smith*, 317 N.C. 100, 343 S.E.2d 518 (1986); *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574. This test is necessarily an objective one to be applied on a case-by-case basis considering all the facts and circumstances. Evidence before the trial court tended to show that defendant initiated his initial interview with officers of the Atlantic Beach Police Department at approximately 7:00 p.m. on 11 September 1990.

Based upon evidence introduced at a voir dire hearing where Chief Duke and Captain Wrenn testified, the trial court made findings and concluded that defendant was not "in custody" at the time of his initial interview with Chief Duke and Captain Wrenn. After being advised by the Wake County officers that there was no outstanding arrest warrant for defendant, Chief Duke instructed his officers to tell defendant he was free to leave. Chief Duke personally told defendant that he could leave. The record indicates that defendant was told he was free to go approximately one-half hour after the initial arrest. Chief Duke informed defendant that Wake County officers were on the way to Atlantic Beach and wanted to talk with him. Chief Duke indicated to defendant that he was free to go or that if he chose to remain and speak with the Wake County officers, he was free to move about the police station while he waited. Defendant told Chief Duke that he knew a little about what the Wake County officers wanted to talk with him about and that he wanted to stay and talk with an officer. Defendant remained at the station, with his money and cigarettes on a table in front of him. The record indicates that a public phone was available to defendant throughout the time he remained at the station.

Defendant contends that while he was able to move about the police station freely, it is significant that he was constantly in the presence of at least one uniformed officer and that when he needed to use the rest room, he was escorted by a police officer. We disagree. The record indicates that the Atlantic Beach Police Department facility is a small one and that during the time defendant was waiting for the Wake County officers to arrive, numerous Atlantic Beach officers continued about their duties. Anyone who was there would have been constantly in the presence of police officers. It is also unlikely that anyone would have been permitted to wander unmonitored around police headquarters, and therefore

it is not unusual that defendant would have been escorted to the rest room. It is not determinative on the issue of custody that defendant was in the presence of uniformed officers and was escorted to the rest room. *State v. Davis*, 305 N.C. at 416-17, 290 S.E.2d at 580-81.

Defendant repeatedly told Atlantic Beach police officers that he wanted to go ahead and make a statement to them. Chief Duke told defendant that he would rather that defendant talk to the Wake County officers when they arrived because they would be more familiar with the facts of the case. The record indicates that after numerous requests, Captain Wrenn and Chief Duke agreed to take defendant's statement. The trial court's findings that defendant was told that he was free to go and that he subsequently volunteered to stay and repeatedly sought interviews with Atlantic Beach officers are supported by competent and substantial evidence and are thus binding on this Court. *State v. Mahaley*, 332 N.C. 583, 423 S.E.2d 58; *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574. Furthermore, those findings compelled the trial court's conclusion that defendant was not "in custody" and "that a reasonable person in the defendant's situation would have believed that he was free to leave the Atlantic Beach police department." Because we find that defendant was not in custody at the time he gave his statement to Chief Duke and Detective Wrenn, defendant did not have a right to have counsel present. Thus, it is unnecessary for us to determine whether defendant properly waived his right to counsel.

[3] Assuming *arguendo* that defendant was in custody and did have a right to counsel when he sought to give a statement, he nonetheless effectively waived this right. Although defendant was free to leave, he was read his *Miranda* rights. The trial court's findings of fact and the supporting record indicate that in response to the question concerning the desire for counsel, defendant stated, "Yes—I know you can't get one now but I want to talk to you. I'll get a lawyer for my trial." The record indicates that at this point Chief Duke indicated to defendant that he was not personally going to go out and get an attorney for defendant but he would get a telephone book for the defendant so that he could look up an attorney. Defendant then responded, "No, sir, I don't want an attorney."

Defendant contends that his response, "Yes—I know you can't get one now but I want to talk to you. I'll get a lawyer for my

## STATE v. MEDLIN

[333 N.C. 280 (1993)]

trial," constitutes an unambiguous invocation of the right to counsel, and all further exchanges with him should have ceased. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707. Additionally, defendant argues that his subsequent statements, made following his assertion of a desire for counsel, may not be used to cast doubt on his initial invocation of his rights. *Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488 (1984). We disagree. When asked if he wanted a lawyer, defendant did not simply respond, "Yes"; he continued immediately with the qualification, "I know you can't get one now but I want to talk to you. I'll get a lawyer for my trial." "There are no 'magic words' which must be uttered in order to invoke one's right to counsel." *Torres*, 330 N.C. at 528, 412 S.E.2d at 26. The issue becomes whether defendant has indicated "in any manner" that he desires the presence or aid of counsel while being interrogated. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707. We hold that defendant did not invoke his right to counsel while being interrogated, as he did not indicate that he wanted the aid of counsel during questioning. Defendant waived his right to counsel during questioning and preserved his right to an attorney at trial. This interpretation of defendant's statement is further supported by defendant's later response when asked by Wake County Detective Toler whether he wanted a lawyer prior to questioning. Defendant stated and wrote on the *Miranda* form, "Not at this time but when I go to court."

This case is distinguishable from *Smith v. Illinois*, where the defendant initially invoked his right to counsel by saying, "[Y]eah. I'd like to do that," and then was questioned further by police until he finally reversed his position by saying, "All right. I'll talk to you then." *Smith*, 469 U.S. 91, 93, 83 L. Ed. 2d 488, 492 (1984). Defendant did not reverse his position here. He initially stated that he did not want a lawyer at that time but wanted a lawyer for his trial. Then he said, "No, sir, I don't want an attorney."

Alternatively, defendant contends that should his statement be read as ambiguous, it still constitutes an invocation of counsel because "when faced with an ambiguous invocation of counsel, interrogation must immediately cease except for narrow questions designed to clarify the person's true intent." *Torres*, 330 N.C. at 529, 412 S.E.2d at 27. Defendant contends that in this case, the officers made no attempt to clarify defendant's true intent. This argument must also fail. Defendant was asked if he wanted an attorney, to which he replied, "Yes—I know you can't get one

STATE v. MEDLIN

[333 N.C. 280 (1993)]

now but I want to talk to you. I'll get a lawyer for my trial."
Chief Duke indicated to defendant that he was not personally going
to go out and get an attorney for defendant but he would get
a telephone book for the defendant so that he could look up an
attorney. Defendant then responded, "No, sir, I don't want an at-
torney." "Miranda does not require that attorneys be producible
on call . . . ." *Duckworth v. Eagan*, 492 U.S. 195, 204, 106
L. Ed. 2d 166, 178 (1989). By telling defendant that while he could
not get an attorney for him personally but would provide defendant
with the means of acquiring one himself, Chief Duke was arguably
attempting to clarify whether defendant in fact wanted an attorney.
It is clear from the record that, at this point, defendant responded,
"No, sir, I don't want an attorney." We conclude that the evidence
supports the trial judge's conclusion that this was defendant's true
intent.

[4] Additionally, defendant argues in the alternative that defend-
ant's statements must be suppressed because his waiver of counsel
was not knowing, intelligent, and voluntary. *Miranda*, 384 U.S.
at 444, 16 L. Ed. 2d at 707. We disagree. We must look to the
totality of the circumstances to determine whether a confession
is voluntarily made. *State v. Corley*, 310 N.C. 40, 311 S.E.2d 540
(1984). Defendant contends that his waiver could not have been
voluntary because he did not fully understand the nature of the
right being abandoned. We disagree. Defendant was read his *Miranda*
rights, which explained that defendant was entitled to counsel dur-
ing questioning, not just at trial. Additionally, defendant was no
stranger to the process. Defendant had previously been charged
and convicted of robbery and, in connection therewith, had twice
been advised and waived his rights.

Finally, the record indicates that defendant insisted on giving
a statement to the Atlantic Beach officers in an apparent attempt
to divert suspicion to another individual before the Wake County
officers arrived. The record indicates that numerous officers testified
that defendant's faculties seemed in no way impaired. Defendant
had cigarettes available to him. Defendant took bathroom breaks
and was provided with food and drink. When defendant asked
to see his girlfriend, he was given this opportunity. Our review
of the entire record leads us to conclude that the trial court's
findings were supported by substantial and competent evidence.
Those findings in turn support the trial court's conclusion that

defendant voluntarily, knowingly, and intelligently waived his right to counsel before he gave his statements to the officers.

In addition to arguing that his statements during his initial interview with Atlantic Beach officers should be suppressed, defendant contends that his subsequent statements made during all later interviews and all resulting physical evidence should be suppressed under the "fruits of the poisonous tree" doctrine because they are the product of an illegal arrest and the fruit of an initially unconstitutional interrogation without counsel. Having concluded that defendant's initial arrest was lawful and that he was neither in custody nor entitled to the presence of counsel when the initial statement was made, his subsequent statements and the resulting evidentiary fruits were not tainted.

[5] Defendant makes one further argument. Defendant moved for exclusion of all of his statements and the resulting evidentiary fruits on the basis of our state Constitution as well as the federal Constitution. Throughout his brief, defendant has suggested that, even if we should reach the result we have reached under the pertinent amendments to the United States Constitution, Article I, Section 23 of the North Carolina Constitution requires a different result, that is, that all such evidence be excluded. We disagree. We have held herein (1) that defendant's initial warrantless felony arrest was based on probable cause and was therefore lawful, (2) that defendant was released and told he could leave and was not thereafter in custody, and (3) that defendant was therefore not entitled to the presence of counsel. Defendant has cited no authority, and we know of none, wherein Article I, Section 23 has been applied differently in regard to these three particulars.

We hold that the trial judge properly denied defendant's motion to suppress his statements (and resulting physical evidence) made subsequent to his initial statement.

We conclude that the trial court properly denied defendant's motions to suppress.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.

Justice FRYE concurring in result.

Having concluded that defendant was not in custody at the time he gave his statement to Chief Duke and Detective Wrenn and therefore did not have a right to have counsel present, the majority then proceeds to the question of whether defendant waived his right to counsel. I find it unnecessary to decide the question of whether defendant waived a right which he did not have. Thus, I do not join that portion of the opinion which assumes *arguendo* that defendant was in custody, had a right to counsel, but nevertheless waived that right.

Chief Justice EXUM and Justice MITCHELL join in this concurring opinion.