STATE OF NORTH CAROLINA v. DANIEL KAY ALLEN

No. 42

(Filed 12 June 1979)

1. **Burglary and Unlawful Breakings § 7— first degree burglary—intent to commit rape—failure to submit nonfelonious breaking or entering**

    In a prosecution for first degree burglary in which the indictment alleged an intent to commit the felony of rape, the trial court was not required to submit nonfelonious breaking or 'entering as a permissible verdict where the State's evidence tended to show that the victim's assailant grabbed her around the mouth from behind and said, "I'm going to f--- you right now"; she screamed and fought with her attacker for about five minutes during which he threatened to kill her, got her down on the floor, got down beside her, and tried to remove her clothing; in the struggle she received a battered lip and a knot on her neck; and she continued to scream and her assailant apparently became frightened and ran out the door; and where defendant's evidence tended to show alibi and a case of mistaken identity.

2. **Rape § 18.4— assault with intent to rape—failure to submit assault on a female**

    In this prosecution for assault with intent to commit rape, the trial court did not err in failing to submit the lesser included offense of assault on a female as a permissible verdict where all of the evidence concerning the assault tended to show that the purpose of the victim's assailant was to commit rape in that he declared his intent to have intercourse with her when he initially grabbed her, he threatened to kill her if she continued to scream, and he struggled with her in an attempt to remove her clothing.

DEFENDANT appeals from judgments of *Clark, J.*, 23 October 1978 Criminal Session, BRUNSWICK Superior Court.

Defendant was charged in separate bills of indictment with first degree burglary and assault with intent to commit rape. The two charges grew out of an incident at the trailer home of Regina Wells on 30 April 1978.

The State's evidence tends to show that Regina Wells, age twenty, lived alone in Azalea Trailer Park located one and one-half miles from the Clover Leaf Trailer Park in Leland, North Carolina, where defendant, twenty-four years of age, lived with his wife and child. On 30 April 1978 Miss Wells was working the 4 p.m. to midnight shift at Carolina Power and Light Company in Southport. She left her place of work at midnight and arrived home about 12:30 a.m. On 30 April 1978 defendant was employed at the Hercules plant near Wilmington. He also worked the 4 p.m. to midnight shift. It takes about twenty-five minutes to drive from his place of work to his home in Clover Leaf Trailer Park.

Upon arrival at her home in Azalea Trailer Park, Miss Wells removed her dress, put on a bathrobe, and talked with the babysitter for about thirty minutes. The babysitter then left and Miss Wells went to the back of her trailer to wash some clothes. All doors to her trailer were closed but not locked. There were three lights burning in the kitchen and one in the living room. When she returned to the kitchen-living room area—"just one big room with a bar separating it"—someone grabbed her from behind and said, "I'm going to f--- you right now." At that time she was clad in her underwear and a bathrobe with the belt tied in a knot at the waist. Miss Wells screamed, and he said he would kill her if she screamed. She continued to scream and struggled with her assailant for about five minutes. They fought and tussled. Her attacker got her down on the floor and got down beside her but did not succeed in removing her clothing. She received a "busted" lip and a knot on her neck during the struggle. She continued to scream and her assailant apparently became scared, got up and ran out the door. She had never seen the man before this incident, but asserted "I saw him good" during the five-minute struggle.

On 4 September 1978 Miss Wells saw defendant Daniel Kay Allen at Parker's, a local grocery store, and immediately recognized him as the man who assaulted her in her home on the night of 30 April 1978. She testified: "I was in the checkout line in front

of the door and he walked in the door while I was paying the lady for my merchandise. I first saw him when the door opened. It is right there at it and you can see everybody coming in and out. When I saw him I knew it was him and he knew it was me also. I had already paid. I walked outside and got in my car. And about that time he was leaving and I got his license plate number. When he came into Parker's I saw him look at me and he just turned his head and walked on. He walked around the magazine rack and then out. I didn't see him buy anything. After I got the license number I called the sheriff's department and I later gave the license number to Marty Folding."

Defendant was duly apprehended and taken to the sheriff's office. Miss Wells was called to the sheriff's office to view the defendant. She looked at him briefly but said nothing. Defendant said, "Please, lady, please, I'm a religious man." Miss Wells was facing him at that time and recognized his voice as the same voice she heard in her trailer the night she was assaulted.

When Miss Wells reported the incident to the sheriff's department on the night of the occurrence, she described the suspect as a white male, approximately 6 feet tall, weighing about 155 pounds, clean shaven, brown short hair, and a real pale complexion. She said he was dressed in blue jeans and a light colored short-sleeved shirt.

Defendant offered evidence and testified in his own behalf. He said he was twenty-four years of age, 6 feet 1 inch tall, weighed 155 pounds, and on the date in question lived at Clover Leaf Mobile Home Park in Leland. He testified that his wife and little girl lived with him; that on the night of 29 April 1978 he got off work at midnight and went home; that he did not go to Azalea Trailer Park in the early morning hours of April 30; that he had never seen Miss Wells prior to the time he saw her at the sheriff's office; that he had never met her formally or informally; that he had no friends who lived in Azalea Trailer Park and did not know anyone who lived there; that he did not own any blue jeans or any short-sleeved shirts; that he had never worn short-sleeved shirts because his arms are too small—"it's just something personal to me."

Defendant further testified that on 4 September 1978 he went to Parker's Grocery Store to pick up two items for his wife,

a can of Lemon Pledge and a can of Wizard Air Spray; that he bought and paid for those items at the checkout counter; that he had no recollection of seeing Miss Wells in Parker's Store on that afternoon.

On cross-examination defendant admitted that he initially denied going to Parker's Store when questioned by Officer Folding but explained that "[t]hey were accusing me of three different counts. I did not deny to them that I went to Parker's. I denied the fact of breaking into Parker's. That is what I was denying. I did not tell Mr. Folding that I hadn't left the house all day. I did go to Parker's." He further stated that Azalea Trailer Park where Miss Wells lived was about a mile and a half from Clover Leaf Trailer Park where he lived. At the time he talked with Officer Folding he said he could not associate the name "Azalea" with that particular trailer park—"I had a brother who lived there three years ago but I didn't know the name of the trailer park."

Defendant's wife testified that she had no independent recollection of the night of April 29 but did not recall that her husband arrived home late at any time during the Spring of 1978. She further stated that her husband did not have in his wardrobe any short-sleeved shirts whatsoever and did not have any blue jeans.

Defendant offered various character witnesses who testified that his general reputation in the community was good.

In rebuttal, Officer Folding testified that when he arrested defendant on 4 September 1978 and questioned him, defendant first said he had been home all day and wasn't at Parker's—"he told me that maybe twice." When informed that a lady had seen him at Parker's about four o'clock, "then he told me that he went down there and that he went to Mack's Auto Parts to buy a toggle switch and that he went into Parker's, I believe, to get two items." Defendant stated four times to Officer Folding that upon leaving Parker's Store he went straight home. Officer Folding then told him the woman said he pulled out of the parking lot at Parker's and turned right into Belvedere Estates. Defendant then replied that he had forgotten that he went by his Uncle Ben's house to see about borrowing a guitar. Officer Folding then asked defendant if he knew where Azalea Plaza Trailer Park was and

defendant replied, "No." Officer Folding further testified: "I described that you would go to S & W Grocery and go down Fayetteville Road toward North Brunswick and it would be the first trailer park on the right. He said 'No, sir.' I asked him four or five — five more times if he was sure he didn't know where the trailer park was. And he stated 'no,' he did not. I told him that his story would be checked out about not knowing where the trailer park was. He stated at that time, 'Oh, I guess you ought to know that my brother lived there about three years ago.' I asked him if he had visited his brother in that trailer park, and he said 'Yes.' I asked him how many times. And he said he couldn't tell me the number of times he had been to the trailer, but he had been to see his brother numerous times at the trailer park."

Defendant was convicted as charged and sentenced to life imprisonment for the burglary and ten years for the assault with intent to commit rape, to run concurrently. He appeals, assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Assistant Attorney General, for the State.*

*Ray H. Walton and William F. Fairley, attorneys for defendant appellant.*

HUSKINS, Justice.

[1] Defendant assigns as error the failure of the trial court to submit nonfelonious breaking or entering as a permissible verdict, thereby limiting the jury in its deliberations to either a verdict of guilty of first degree burglary or not guilty.

In the burglary case the bill of indictment charges that defendant broke and entered the occupied dwelling house of Regina Wells in the nighttime with intent to commit a felony therein, to wit: "with the unlawful, wilful and felonious intent to ravish and carnally know Regina Wells by force and against her will. . . ." Upon that charge the State is required to prove the intent to commit the felony designated in the indictment. *State v. Wells*, 290 N.C. 485, 226 S.E. 2d 325 (1976); *State v. Allen*, 186 N.C. 302, 119 S.E. 504 (1923).

Defendant does not contend the evidence of such intent was insufficient to carry the case to the jury. Rather, he contends the

evidence of intent to rape "was such that the jury should have been allowed to decide the presence or lack thereof and to have been given the option of convicting the appellant on a lesser offense which did not require the presence of such intent." Defendant therefore argues that the lesser included offense of nonfelonious breaking or entering should have been submitted.

Where it is permissible under the bill of indictment to convict the accused of a lesser degree of the crime charged, *and there is evidence to support a milder verdict*, defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions. *State v. Duboise*, 279 N.C. 73, 181 S.E. 2d 393 (1971). Unless there is evidence of guilt of the lesser degree, however, the court should not submit it. *State v. Smith*, 201 N.C. 494, 160 S.E. 577 (1931). If all the evidence tends to show that the crime charged in the bill of indictment was committed, and there is no evidence tending to show commission of a crime of lesser degree, the court correctly refuses to charge on the unsupported lesser degree and correctly refuses to submit lesser degrees of the crime charged as permissible verdicts. *State v. Alston*, 293 N.C. 553, 238 S.E. 2d 505 (1977); *State v. Harvey*, 281 N.C. 1, 187 S.E. 2d 706 (1972); 4 N.C. Index 3d, Criminal Law, § 115.

The crime of burglary is complete when one person breaks and enters the occupied dwelling of another, in the nighttime, with the requisite ulterior intent to commit the felony designated in the bill of indictment, even though, after entering the house, the accused abandons his intent through fear or because he is resisted. *State v. Wells, supra; State v. Bell*, 285 N.C. 746, 208 S.E. 2d 506 (1974).

The record in this case is barren of any evidence of nonfelonious breaking or entering. The evidence for the State tends to show that the victim's assailant grabbed her around the mouth from behind and said: "I'm going to f--- you right now." She screamed and fought and tussled with her attacker for about five minutes during which he threatened to kill her, got her down on the floor, got down beside her, and tried to remove her clothing. In the struggle she received a battered lip and a knot on her neck. She continued to scream and her assailant apparently became frightened and ran out the door. Defendant's evidence

tends to show alibi and a case of mistaken identity. Thus, the State's evidence strongly suggests the intent to rape which was later abandoned through fear because Miss Wells continued to scream and resist, while defendant's evidence tends to prove he was elsewhere and the crimes charged, if committed at all, were committed by someone else. There is no evidence of a nonfelonious breaking or entering. On the evidence of record defendant was guilty of the crimes charged in the bills of indictment or he was not guilty of any offense. *State v. Alston*, supra. Defendant's first assignment of error is overruled.

[2] In the case charging assault with intent to commit rape, defendant contends the court erred in failing to submit, as a permissible verdict, the lesser included offense of assault on a female.

This assignment involves the same legal principles discussed with respect to the first assignment of error. It suffices to say that all of the evidence concerning the assault committed upon Miss Wells tends to show that the purpose of her assailant was to commit rape. His declaration when he initially grabbed her so indicates. His threat to kill her if she continued to scream so indicates. His struggle to disrobe her so indicates. "There is no evidence whatever tending to show that she was assaulted for any other purpose, or for no purpose. Under these circumstances, it was not error to instruct the jury that they might return either a verdict of guilty of assault with intent to commit rape or a verdict of not guilty." *State v. Roseman*, 279 N.C. 573, 184 S.E. 2d 289 (1971). Lesser included offenses must be submitted when, and only when, there is evidence to support them. *State v. Watson*, 283 N.C. 383, 196 S.E. 2d 212 (1973).

*State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978), cited and relied on by defendant, is clearly distinguishable. There, some of the evidence tended to show that it was not defendant's intent to rape the victim but rather to gratify his passion in other ways. Hence, there was evidence sufficient to support a conviction of assault with intent to commit rape or a conviction of assault upon a female, depending upon defendant's intent at the time of the assault. This created a jury question.

For the reasons stated defendant's second assignment of error is overruled.

A careful review of the entire record reveals a fair trial free from prejudicial error. The verdicts and judgments must therefore be upheld.

No error.