STATE OF NORTH CAROLINA v. JESSIE JAMES CORBETT

No. 372A93

(Filed 30 December 1994)

1. **Evidence and Witnesses §§ 1694, 1710 (NCI4th)— noncapital first-degree murder—photographs of victim and crime scene—admissible**

The trial court did not err in a noncapital first-degree murder prosecution by allowing into evidence twenty gruesome photographs of the crime scene and the victim and in allowing the photographs to be held in front of the jury where the display of the photographs was not unnecessarily repetitious and they were used to illustrate competent testimony.

**Am Jur 2d, Evidence §§ 974, 975.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

**2. Evidence and Witnesses § 1235 (NCI4th)— noncapital first-degree murder—defendant's statements—no custodial interrogation**

The trial court did not err in a noncapital first-degree murder prosecution by admitting defendant's inculpatory statements where defendant contended that they were illegally obtained during a custodial interrogation but the evidence supported the trial court's findings that defendant was on his own premises and free to go about his business during the first two interviews, and, at the third interview, also at defendant's home and at the crime scene, the SBI agents' manner was not threatening, their language not coercive, defendant was not forced to take the agents to the scene of the crime, and defendant was repeatedly told that he was not under arrest and would be taken home any time he requested. These findings compelled the court's conclusion that defendant was not "in custody" for *Miranda* purposes as a reasonable person in defendant's position would have concluded he was free to terminate the interviews if he so chose.

**Am Jur 2d, Criminal Law §§ 793, 794; Evidence § 749.**

**What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

**3. Evidence and Witnesses § 1218 (NCI4th)— noncapital first-degree murder—defendant's statements—voluntary**

The trial court did not err in a noncapital first-degree murder prosecution by admitting defendant's inculpatory statements where defendant contended that the statements were not made knowingly, intelligently, or voluntarily, but none of the evidence presented suggests that defendant's mental capacity was in any way impaired, that his will was overpowered, or that the officers attempted to physically or psychologically torture defendant to evoke a confession, the court found that "defendant was never promised anything, was never threatened, and had no offers of reward or of assistance with any prosecution in the event he did cooperate with the officers," and defendant made a correction in the written statement. Applying the totality of the circumstances standard, there was no error in concluding that defendant's constitutional rights were not violated and that the statements were admissible.

**Am Jur 2d, Evidence §§ 719 et seq.**

**4. Criminal Law § 382 (NCI4th)— noncapital first-degree murder—court's questions to medical examiner—no error**

The trial court did not err in a noncapital first-degree murder prosecution by asking the medical examiner questions which defendant contended were irrelevant and placed undue emphasis on the wound, but the questions were intended to clarify the medical examiner's description of the position of the bullet which caused the victim's death and did not intimate the judge's opinion regarding the witness's credibility, defendant's guilt, or any factual controversy to be resolved by the jury.

**Am Jur 2d, Trial §§ 274, 275.**

**5. Criminal Law § 380 (NCI4th)— noncapital first-degree murder—court's impatience with defense counsel—no impropriety**

There was no impropriety and no prejudice in a noncapital first-degree murder prosecution where defendant asked to view an SBI agent's notes which had been relied upon during direct examination, the State responded that the notes were in the evidence locker, and the court told defense counsel that had the district attorney been notified that the defense wished to use the document during its cross-examination of the witness, arrangements could have been made to have them in the courtroom when they were needed. Read in context, the court's remarks are not overly critical or unfairly derogatory of defense counsel and contain no hint of partiality or favoritism.

**Am Jur 2d, Trial §§ 302 et seq.**

**Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal. 62 ALR2d 166.**

**6. Criminal Law § 387 (NCI4th)— noncapital first-degree murder—admonition to defendant to speak up—no error**

There was no error in a noncapital first-degree murder prosecution where the court asked defendant to speak up during his testimony and remarked, "If he's saying something, it has to go in the record."

**Am Jur 2d, Trial § 299.**

**7. Criminal Law § 372 (NCI4th)— noncapital first-degree murder—sustaining objection—no expression of opinion**

The trial court in a noncapital first-degree murder prosecution did not express an opinion in sustaining an objection.

**Am Jur 2d, Trial § 284.**

**8. Evidence and Witnesses § 2507 (NCI4th)— noncapital first-degree murder—testimony of officers—personal knowledge**

The trial court did not err in a noncapital first-degree murder prosecution by permitting an SBI agent to testify that the local doctor had said that the fatal bullet was .38 caliber, that defendant had told the officer that he shot the victim with a .38 caliber pistol at a point in the investigation when no one had informed defendant of the caliber of the gun used to kill the victim, and that no one else would have known the caliber other than the person who shot the victim. Although defendant contends that the officer could not have known whether the doctor told anyone else of the caliber or whether anyone overheard the doctor stating the caliber, the testimony that the doctor and the defendant made these statements directly to the officer establishes his personal knowledge of the subject and the State was properly allowed to use the testimony to draw an inference that defendant could not have known the caliber of the murder weapon at the time he made his statement unless he was the murderer. Defendant was free to cross-examine about other individuals with knowledge of the caliber.

**Am Jur 2d, Witnesses §§ 75, 76.**

**9. Evidence and Witnesses § 2507 (NCI4th)— noncapital first-degree murder—testimony of officers—personal knowledge**

There was no error in a first-degree murder prosecution where the trial court allowed an SBI agent to testify about a drill and bit seized from defendant and tested unsuccessfully to determine whether the shavings on the bit came from a drilled out gun barrel, and that the effect of the drilling was to eliminate the agent's ability to determine whether the fatal bullet was fired from the gun and the distance between the gun and the victim. Although defendant contended that the State had no evidence that the fatal bullet was fired from defendant's gun, that defend-

ant had drilled out the barrel, or that the barrel was drilled with defendant's drill and bit, and that the sole evidence relating to defendant's barrel was defendant's testimony that the barrel had been drilled when he bought the gun, the evidence was relevant and fell within the personal knowledge of the witness, a forensic firearms and tool marks examiner with the SBI. Defendant was free to challenge the witness's conclusions on cross-examination.

**Am Jur 2d, Witnesses §§ 75, 76.**

**10. Evidence and Witnesses § 876 (NCI4th)— noncapital first-degree murder—hearsay statements of victim—state of mind—admissible**

The trial court did not err in a noncapital first-degree murder prosecution by admitting testimony that the victim, a practical nurse, had told a person at whose house she worked that defendant was the father of her child and that she feared for her life if she went to court to obtain child support from defendant. The scope of the conversation related directly to the victim's state of mind and emotional condition, the victim's state of mind was relevant as it related directly to circumstances giving rise to a potential confrontation with defendant on the day she was murdered, and the probative value of this evidence was not outweighed by unfair prejudice. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence § 866.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

**11. Evidence and Witnesses § 867 (NCI4th)— noncapital first-degree murder—statement as to defendant's location— explanation of subsequent conduct**

The trial court did not err in a noncapital first-degree murder prosecution by admitting the testimony of an S.B.I. agent that defendant's wife had said that defendant was at his father's home on the day defendant had promised to give the agent his gun. The testimony was not offered to prove the truth of the matter asserted but rather to explain the agent's actions after he was unable to retrieve the gun from defendant although defendant had promised to deliver the gun to the police that morning.

**Am Jur 2d, Evidence § 666.**

**12. Evidence and Witnesses § 84 (NCI4th)—noncapital first-degree murder—cross-examination of defendant—motivation for lying**

The trial court did not err in a prosecution for noncapital first-degree murder by allowing the State to cross-examine defendant concerning the motivations a person may have for lying where defendant contended that this line of questioning was irrelevant. This line of questioning was relevant to show that defendant had a motive to lie and possibly to murder in avoiding paying child support and protecting his family from the embarrassment of being publicly regarded as the father of the victim's child.

**Am Jur 2d, Evidence §§ 307 et seq.**

**13. Homicide § 262 (NCI4th)— first-degree murder—felony murder—evidence sufficient**

The evidence was sufficient to carry charges of first-degree murder and discharging a firearm into an occupied vehicle to the jury in a first-degree murder prosecution which resulted in a conviction based on felony murder where testimony was offered by the State from numerous witnesses tending to show that the victim accused defendant of fathering her child; intended to seek court-ordered child support from defendant; argued intensely with defendant several days before her death; admitted to her minister that she feared for her life; died as a result of a gunshot wound to her head, inflicted as she sat in her car; the medical examiner removed a .38-caliber bullet from the victim's scalp; defendant twice denied owning a pistol, but police officers subsequently recovered a .38-caliber pistol from defendant; the barrel of defendant's gun had been drilled out; defendant owned a drill and drill bit and had access to his father's drill between the time of the murder and when his gun was taken by the police; defendant washed his hands with gasoline after agreeing to, but before submitting to, a gunshot residue test; and defendant's inculpatory statement was previously determined to be admissible.

**Am Jur 2d, Homicide § 442.**

**14. Homicide § 556 (NCI4th)— first-degree felony murder—refusal to instruct on second-degree murder and manslaughter—alibi defense**

The trial court did not err in a prosecution for first-degree murder and discharging a firearm into a vehicle by refusing to

instruct on second-degree murder and manslaughter where defendant's defense was an alibi. Defendant cannot tell the jury that he was innocent of the crime because he was elsewhere when it occurred and that the inculpatory statements were not true and also demand to have the jury instructed on second-degree murder and manslaughter based on portions of his inculpatory statements which were favorable to him when taken out of context.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

15. **Criminal Law § 496 (NCI4th)— first-degree felony murder— request of jury to view transcript—denied**

The trial court did not abuse its discretion in a prosecution for first-degree murder and discharging a firearm into a vehicle by denying the jury's request to review the transcript during its deliberation where the jury's request was ambiguous, the jury foreman at no point specified the clarifications they desired, the questions they had, or the pieces of evidence they wished to review, and the court explained that it would not be fair to give the jury only portions of the testimony taken out of context when the foreman asked to review the transcript in general. The trial court exercised its discretion and complied with the requirements of N.C.G.S. § 15A-1233(a).

**Am Jur 2d, Trial §§ 1685 et seq.**

**Right to have reporter's notes read to jury. 50 ALR2d 176.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Llewellyn, J., at the 12 April 1993 Criminal Session of Superior Court, Pender County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment entered for discharging a firearm into occupied property was allowed 20 September 1993. Heard in the Supreme Court 11 May 1994.

*Michael F. Easley, Attorney General, by Thomas· F. Moffitt, Special Deputy Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

PARKER, Justice.

In a noncapital proceeding, defendant was convicted of the first-degree murder of Katie M. Hansley under the felony-murder rule and of discharging a firearm into an occupied vehicle. The trial court sentenced defendant to life imprisonment for the murder conviction and arrested judgment on the felony conviction since it served as the predicate felony for the felony-murder conviction.

The State presented evidence at trial tending to show that on the morning of 16 April 1992, the victim's body was discovered by Walter Tompkins, a local farmer. Victim's body was in her automobile on the shoulder of Highway 210 in Pender County. Tompkins testified he turned off the ignition, searched for a pulse, and, finding none, left to call the authorities. The first officer on the scene, Pender County Deputy Sheriff Charles Rollins, found a young black female, dressed in a nurse's uniform, seated in the driver's seat of a car, slumped to her right. Blood and cerebral fluid were flowing down her neck and back forming a puddle behind the driver's seat. The officer found no evidence of a struggle.

An autopsy was performed at Onslow Memorial Hospital in Jacksonville, North Carolina, by Dr. Walter Gable. Dr. Gable testified he found an entrance wound on the left side of the victim's nose with powder burns around it. The powder burns revealed that the gun had been fired from a very close range. Dr. Gable surmised that the victim died as the result of a gunshot wound to her head.

Reverend Vinella Evans testified that the victim had consulted with him several days before her death. The victim claimed that defendant was the father of her child and that she feared for her life if she went to court to obtain child support from defendant. The victim's daughter, Charonda Martin, testified that her mother and defendant argued angrily several days before the day of the murder about child support for LaQuan, Charonda's half brother.

On the evening of 16 April 1992, SBI Agent Bruce Kennedy and Detectives Douglas Blose and James Ezzell of the Pender County Sheriff's Department went to defendant's residence. Defendant told the officers his daughter had informed him that a woman had been killed earlier that day and he assumed they had come to discuss it with him. Defendant informed the officers that he had recently heard a rumor that he was "going with" the victim and had fathered one of her children. While sitting in Agent Kennedy's vehicle, defendant

denied the allegation but admitted to having had sexual relations with the victim on two occasions several years before. He further denied owning a handgun or ever having argued with the victim concerning child support. Defendant said he left his house that morning at approximately 8:30 a.m. to drive to Burgaw to cut grass for Bertha Nixon; he also told the officers he waved to the victim in her front yard at 8:00 a.m. as he drove by but denied driving down Highway 210 at any time during the day. After consenting to a gunshot residue test, defendant washed his hands in gasoline on the opposite side of the car from where Agent Kennedy was preparing the test. The test had negative results. Defendant claimed he accidentally spilled the gasoline on himself.

After learning from defendant's daughter that defendant owned a handgun, the officers again interviewed defendant. Defendant again denied owning a handgun. He reiterated his previous story but stated he actually left the house at 7:30 a.m.

The next day the officers returned to defendant's home with SBI Agent Kelly Moser. Defendant consented to a search of his home. During the search, Agent Moser asked defendant to step outside with him. While standing in the front yard, Agent Moser told defendant he had just become involved with the case but that it appeared to be a domestic dispute which had simply gotten out of hand. Agent Moser added that he was interested only in the truth and that he didn't believe defendant had been honest during the initial interviews. At first defendant denied any involvement in the murder, but later asked what would happen to him if he admitted killing the victim. Agent Moser stated he just wanted the facts and that defendant would not be arrested that day. When the two men returned to the house, defendant told his wife he was going to show the officers the route he had taken the previous day.

Defendant then directed the officers to the Jesus Christ Worship Center Church on Highway 210 near where the victim's body had been found. Defendant told the officers that early on the morning of 16 April 1992 the victim passed him on the highway and motioned for him to pull over. He parked behind her car and walked up to the driver's side. As he approached the car, he mentioned he had been on his way to see her and the victim replied, "I bet you were, m————," and drew back her right hand as if to slap him. Defendant pulled his .38-caliber Smith and Wesson pistol from his

pocket and shot the victim in the face. Defendant told the officers he fled the scene without knowing whether he had injured the victim.

After this confession, defendant told the officers he intended to lie to his wife and tell her he had been pressured into making the statements. Defendant refused to sign a written version of his statements and was taken home by the officers after assuring them he would retrieve the murder weapon for them by the next day.

On 18 April 1992, the officers returned for the weapon. Defendant informed the men he had talked with a lawyer and that he had only confessed to the crime "to get [them] off of his back." Defendant asserted he was not guilty of anything and handed over his handgun to Agent Kennedy. After leaving the Corbett home, Kennedy noticed that the lands and grooves had been drilled out of the barrel of the gun. The agents returned that afternoon and seized a drill and drill bit from a tool box in defendant's truck. Fresh metal shavings were on the drill bit. Defendant was arrested later that afternoon.

In his own defense, defendant testified he worked for the City of Wilmington, had been married for twenty years, had an eighteen-year-old daughter and had known the victim most of his life. He denied fathering one of the victim's children and denied having been approached by her to pay child support. On the morning of 16 April 1992, he left his home early to go to Atkinson, North Carolina, to pick up a carburetor but on the way remembered that he had agreed to mow Mrs. Nixon's lawn. He returned home at 7:40 a.m. and left again at 8:20 a.m. with his lawn mower. Defendant arrived at Mrs. Nixon's home in Burgaw, North Carolina, around 9:00 a.m. He mowed the lawn and left at 1:30 p.m.

Defendant further stated, that although he was under extreme pressure from the police, he consistently denied killing the victim. Finally he gave up and said, "whatever you want to say, say it." Defendant testified he did not know that gasoline would remove gunshot residue from his hands, and he denied drilling out the barrel of his handgun to prevent identification. He added that he told the officers during the initial interview that he owned a handgun but they did not ask him for it. Defendant concluded his testimony by denying he had been to the victim's home several days before the murder and suggested that Charonda Martin had lied about the argument.

Bertha Nixon testified that on the morning of 16 April 1992, defendant arrived at her home between 8:45 a.m. and 9:00 a.m., and

did not leave until 1:30 p.m. Larry Wooten, a farmer serving on the Pender County Board of Education, testified that defendant had a good reputation in the community and that he had not heard the rumor that defendant was the father of one of the victim's children.

Additional evidence introduced at trial will be discussed where pertinent to the various issues raised by defendant.

[1] Defendant first contends the trial court committed plain error by allowing into evidence twenty gruesome photographs of the crime scene and the victim. Relying on *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988), defendant argues that when an excessive number of inflammatory photographs are repeatedly shown to the jury, the prejudicial effect outweighs the probative value.

The State introduced twenty photographs to illustrate the testimony of Tompkins and Deputy Sheriff Charles Rollins, the first officer to arrive at the scene of the crime. During his testimony, Tompkins was asked to identify the first nine photographs. He was then asked to illustrate his testimony with the photographs. Over objection, Tompkins was allowed to leave the witness stand and stand in front of the jury box to finish his testimony. As he mentioned each photograph, he walked the length of the jury box displaying the picture to each juror. Deputy Sheriff Rollins also identified the first nine photographs from the witness stand but then moved in front of the jury to identify the next eleven. He continued to stand in front of the jury box while he illustrated his testimony with the photographs. Defendant contends that the cumulative effect of this repeated display of the photographs in front of the jury by both Tompkins and Rollins served only to inflame the passions of the jury, thus entitling defendant to a new trial.

In *Hennis*, this Court set out the criteria for determining the admissibility of photographic evidence as follows:

> The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies—these are all factors

the trial court must examine in determining the illustrative value of photographic evidence and in weighing its use by the state against its tendency to prejudice the jury.

323 N.C. at 285, 372 S.E.2d at 527. We further held that "[p]hotographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526.

State's Exhibits 1 through 20 depicted the exterior of the automobile, the area surrounding the automobile, the contents of the interior of the vehicle (not focusing on the body), and the position of the body inside the vehicle. Only nine of the photographs focused on the victim's body. Four of these nine photographs illustrated the path of blood from the lethal wound to the floorboard and were relevant to show the angle from which the gun was fired into the window of the vehicle. Another photograph which showed very little blood was relevant to illustrate the head and neck area of the victim that Tompkins touched while searching for a pulse. Three of the nine photographs showed the position of the victim's hands and feet. These exhibits were relevant to show that the victim held no weapon or object with which to strike her assailant and that no struggle had occurred prior to the fatal shooting. The final photograph, taken during the autopsy, illustrated the gunshot wound to the victim's nose which was not depicted in any of the other photographs.

While the subject matter of the photographs was gruesome, the number of photographs and the circumstances surrounding their presentation were such that we cannot conclude that their admission into evidence had no rational basis and was for the purpose of inflaming the jury. The display of the photographs was not unnecessarily repetitious and they were used to illustrate competent testimony by either Tompkins or Rollins. The trial court did not abuse its discretion in permitting the photographic evidence to be used to illustrate the testimony of the State's witnesses and to be held in front of the jury. This assignment of error is overruled.

[2] Next, defendant contends the trial court erred in admitting defendant's inculpatory statements for the reason that they were illegally obtained during a custodial interrogation in violation of his right under the Fifth and Fourteenth Amendments to remain silent and to have counsel present during custodial interrogation. *Edwards v.*

*Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Following a *voir dire,* the trial court determined that defendant was not under arrest when he confessed to the murder and that the statement was not made as a result of a custodial interrogation. The trial court further determined that although defendant was never read his *Miranda* rights, the warning was not necessary. The State was allowed to introduce defendant's statements into evidence. Considering the totality of the circumstances surrounding defendant's confession, we find the evidence supported the trial court's findings of fact which, in turn, supported the legal conclusion that defendant's confession was admissible.

"The rule of *Miranda* requiring that suspects be informed of their constitutional rights before being questioned by the police and the rule of *Edwards* guaranteeing the right to remain silent and the presence of counsel during such questioning apply only to *custodial* interrogation." *State v. Medlin,* 333 N.C. 280, 290, 426 S.E.2d 402, 407 (1993). The question of whether a person is "in custody" for purposes of *Miranda,* that is, "whether a reasonable person in the suspect's position would feel free to leave at will or feel compelled to stay," is determined objectively through a case-by-case analysis. *Medlin,* 333 N.C. at 290-91, 426 S.E.2d at 407.

During *voir dire* on defendant's suppression motion, SBI Agents Kelly Moser and Bruce Kennedy testified concerning the circumstances surrounding defendant's statements. Defendant presented no evidence. Agent Kennedy testified that on the evening of 16 April 1992, several law enforcement officers went to defendant's home where defendant met them in the front yard. Defendant said, "well, I believe I know what you want to talk to me about," and then explained that he had heard a woman had been killed that day. Defendant then sat in the police car and talked to the officers. Defendant denied talking or arguing with the victim about child support, denied fathering her youngest child but admitted to previous sexual relations with her years before, denied owning a pistol or having fired a gun in the last few days, and agreed to take a gunshot residue test. Agent Kennedy testified that defendant was not under arrest during this interview. Defendant was free at any time to get out of the car which was sitting in defendant's driveway.

Based on further information Agent Kennedy reinterviewed defendant that same evening. This interview also took place in Agent Kennedy's car in defendant's driveway. Defendant again denied own-

ing a pistol but admitted he had a date planned with the victim for the evening of 17 April 1992. As before, defendant was free to terminate the interview at any point; defendant had not been placed under arrest and was on his own property.

Agent Moser testified that on the afternoon of 17 April 1992, officers again went to defendant's home and this time with defendant's consent searched it. During a private conversation in the front yard between Agent Moser and defendant, Agent Moser informed defendant that the statements he had given to Agent Kennedy the previous day appeared to be incorrect. Defendant, at this point, was not under arrest, was standing in his own yard, and was free to walk away. Defendant initially denied any role in the crime but then asked Agent Moser what would happen to him if he admitted killing the victim. Agent Moser responded that the district attorney could bring charges against him ranging from manslaughter to murder. The two men returned to the house, and defendant told his wife he was going to show the officers where he had been the previous day. Agent Moser assured Mrs. Corbett that defendant was not under arrest at this time.

Defendant directed the agents to the crime scene without prompting or instructions from either agent. As they passed the Jesus Christ Worship Center Church on Highway 210, defendant pointed to where the killing took place. After defendant confessed fully to the killing, Agent Moser informed defendant he would be asked to turn himself in after the officers consulted with the district attorney. Defendant refused to sign a written statement prepared by Agent Kennedy. Agent Moser further testified that defendant was not under arrest when the statements were made, and defendant was not coerced into making the statements or into showing the officers the crime scene. Agent Kennedy added that had defendant asked he would have been taken home.

Based upon this evidence, the trial court found that defendant was on his own premises and free to go about his business during the first two interviews. During the third meeting, the court found that Agent Moser's and Agent Kennedy's manners were nonthreatening, their language was not coercive, they did not force defendant to take them to the scene of the crime, and defendant was repeatedly told he was not under arrest and would be taken home any time he so requested. The trial court then concluded that the statements given to the officers were not the product of a custodial interrogation, that

defendant's constitutional rights had not been violated, and that the statements could be admitted into evidence.

In reviewing the trial court's findings, we find each to be supported by competent and substantial evidence and thus binding on this Court. These findings compelled the court's conclusion that defendant was not "in custody" for *Miranda* purposes as a reasonable person in defendant's position would have concluded he was free to terminate the interviews if he so chose. *See Medlin*, 333 N.C. at 292, 426 S.E.2d at 408; *State v. Mahaley*, 332 N.C. 583, 593, 423 S.E.2d 58, 64 (1992), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 649 (1994); *State v. Phipps*, 331 N.C. 427, 444-45, 418 S.E.2d 178, 187 (1992).

**[3]** Additionally, defendant argues his confession must be suppressed because it was not made knowingly, intelligently, or voluntarily. "Whether or not *Miranda* warnings are required or given, the Fourteenth Amendment requires that a statement be voluntary in order to be admissible." *State v. Wiggins*, 334 N.C. 18, 28, 431 S.E.2d 755, 761 (1993). The State has the burden of proving, by a preponderance of the evidence, that the statement, examined in context with the totality of the circumstances, was voluntary. *State v. Cheek*, 307 N.C. 552, 557, 299 S.E.2d 633, 636-37 (1983). In the present case, nothing in the evidence, when viewed in its totality, suggests that the confession was involuntary. None of the evidence presented suggests that defendant's mental capacity was in any way impaired, that his will was overpowered, or that the officers attempted to physically or psychologically torture defendant to evoke a confession. In addition to the findings noted above which support that defendant was not in custody, the trial court found that "defendant was never promised anything, was never threatened, and had no offers of reward or of assistance with any prosecution in the event he did cooperate with the officers." The trial court also found that defendant made a correction in the written statement. Applying the totality of the circumstances standard, the trial court did not err in concluding that defendant's constitutional rights were not violated and that the statements were admissible. This entire assignment of error is overruled.

**[4]** In his next assignment of error, defendant contends the trial court erred by expressing opinions which denigrated defendant in front of the jury in violation of N.C.G.S. § 15A-1222. Defendant maintains that the court's consistent expression of opinions, throughout the trial,

STATE v. CORBETT

[339 N.C. 313 (1994)]

imparted judicial favoritism towards the State and entitles him to a new trial before an impartial judge and an unbiased jury.

N.C.G.S. § 15A-1222 provides that "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." Even the slightest "intimation of contempt for a party or for counsel may be highly deleterious to that party's position in the eyes of the jury." *State v. Staley*, 292 N.C. 160, 162, 232 S.E.2d 680, 682 (1977). However, the trial court is permitted to "interrogate witnesses, whether called by itself or by a party," N.C.G.S. § 8C-1, Rule 614(b) (1992), "in order to clarify confusing or contradictory testimony," *State v. Ramey*, 318 N.C. 457, 464, 349 S.E.2d 566, 571 (1986).

In the first instance, defendant points to the court's behavior during the State's direct examination of the medical examiner. After Dr. Gable testified he found the fatal bullet lodged under the victim's scalp, the court asked if he meant "that the only thing that kept the bullet from being a clean or a through and through wound was actually the skin of the scalp?" When the doctor replied in the affirmative, the court then asked if "[t]he skull had been penetrated?" Defendant argues that this questioning by the court was irrelevant and placed undue emphasis on the wound.

The purpose behind the court's questions was to clarify the medical examiner's description of the position of the bullet which caused the victim's death. Neither question intimated the judge's opinion regarding the witness' credibility, defendant's guilt, or any factual controversy to be resolved by the jury.

[5] Defendant further contends the trial court improperly expressed its impatience and displeasure with defense counsel for causing a delay in the presentation of evidence. Prior to cross-examining SBI Agent Kennedy, defense counsel asked to view the interview notes which the agent had relied upon during direct examination. When the State responded that the notes were still in the evidence locker, the trial court told defense counsel that had the district attorney been notified that the defense wished to use the document during its cross-examination of the witness, arrangements could have been made to have them in the courtroom when they were needed.

"Jurors respect the judge and are easily influenced by suggestions, whether intentional or otherwise, emanating from the bench. Consequently, the judge 'must abstain from conduct or language

**STATE v. CORBETT**

[339 N.C. 313 (1994)]

which tends to discredit or prejudice the accused or his cause with the jury.' " *State v. Holden,* 280 N.C. 426, 429, 185 S.E.2d 889, 892 (1972) (quoting *State v. Carter,* 233 N.C. 581, 583, 65 S.E.2d 9, 10 (1951)). However, in the case now before us, the trial court communicated no opinion about the evidence or the testimony of the witness. Read in context, the court's remarks are not overly critical or unfairly derogatory of defense counsel. The court's comments contain no hint of partiality or favoritism. "Unless it appears 'with ordinary certainty that the rights of the prisoner have been in some way prejudiced by the remarks or conduct of the court, it cannot be treated as error.' " *Holden,* 280 N.C. at 430, 185 S.E.2d at 892 (quoting *State v. Browning,* 78 N.C. 555, 557 (1877)). Our reading of the record reveals no impropriety by the trial court and defendant has failed to show any prejudice.

[6] In the third instance, defendant contends the trial court chastised defendant for not speaking loudly during his testimony, thus denigrating the importance of his case. The trial court merely asked defendant to speak up and then remarked: "If he's saying something, it has to go in the record." Defendant's argument that this innocuous statement denigrated his case before the jury is wholly without merit.

[7] Finally, defendant contends the trial court further denigrated the value of his case by sustaining the State's objection to the following exchange:

Q.  You hadn't told them about the rifle because he only asked you about the house, is that right?

A.  Right, that's right. Of course, when I went to pull the rifle out of the truck and when I got back there in the back, which he wasn't around there at that time, I went to get the rifle out of the truck, I told the guy I wanted to get it out because I didn't want them to think I was trying to get a gun or something to shoot them or something. I said, well, I'm fixing to get my rifle out of this truck. That's when they said, okay, and one of them got where he would be looking right dead at me, how I come out with it. Y'all have to excuse me if I get kind of like with him or him or whatever. We's looking at something like four different trips to my house at this time, and during this time, it's hard for me to remember exactly.

MR. SPIVEY: I object. The defendant is making a jury argument. He's not answering the question.

THE COURT: Sustained.

We have previously held that "a trial court generally is not impermissibly expressing an opinion when it makes ordinary rulings during the course of the trial." *State v. Weeks*, 322 N.C. 152, 158, 367 S.E.2d 895, 899 (1988). The judge's ruling on the State's objection does not violate N.C.G.S. § 15A-1222.

We conclude that none of the aforementioned instances constitute impermissible expressions of opinion by the trial court. This assignment of error is overruled.

[8] In his next assignment of error defendant contends the trial court erred in permitting State's witnesses, SBI agents Trochum and Kennedy, to testify as to matters about which they lacked personal knowledge in violation of Rules 401 and 602 of the North Carolina Rules of Evidence. We disagree.

The North Carolina Rules of Evidence state that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." N.C.G.S. § 8C-1, Rule 602 (1992). The Commentary to Rule 602 further provides that the "foundation requirements may, of course, be furnished by the testimony of the witness himself; hence personal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception."

After testifying that the local doctor had said the fatal bullet was a .38-caliber, Agent Kennedy was allowed to testify, over objection, that defendant told him he shot the victim with a .38-caliber pistol. At that point in the investigation no one had informed defendant what caliber gun had been used to kill the victim. Agent Kennedy responded, "No," when asked: "[W]as there any way that anyone on earth, other than the person who shot Katie Hansley, would have known what caliber weapon was used to shoot her?" Defendant maintains that Agent Kennedy impermissibly testified to matters beyond his personal knowledge since he could not know if the doctor had told anyone else or if anyone had overheard the doctor stating that the murder weapon was a .38-caliber pistol.

Agent Kennedy's testimony that the doctor and defendant made these statements directly to him establishes his personal knowledge of the subject. *See State v. Riddick*, 315 N.C. 749, 756-57, 340 S.E.2d

55, 59-60 (1986). The State was properly allowed to use Agent Kennedy's testimony to draw an inference that defendant could not have known the caliber of the murder weapon at the time he made his inculpatory statement unless he was the murderer. Defendant was, of course, free to cross-examine Agent Kennedy and Dr. Gable about other individuals who may have obtained knowledge of the caliber of the murder weapon.

[9] Agent Trochum, on cross-examination, was asked: "[W]hat was the purpose of the drill and the drill bit being sent to your office?" Agent Trochum explained that he attempted to determine if the metal shavings on the drill bit came from the gun barrel that had been drilled out. Trochum concluded that he could not "make [a] comparison on whether the metal [on the] drill bit was consistent with the metal from the barrel." On redirect, Trochum was allowed to explain that the effect of drilling lands and grooves from the barrel of the gun eliminated his ability to determine whether the fatal bullet was fired from the gun. It also eliminated his ability to determine the distance between the gun and the victim when the victim was shot; if in fact, the victim had been shot with that particular gun. Defendant contends that, besides having no evidence that the bullet removed from the victim was fired from defendant's gun, or that defendant drilled out the barrel of his .38-caliber pistol, the State also had no evidence that defendant's gun was drilled out with defendant's drill and bit. The sole evidence relating to the barrel of the gun came from defendant, and he testified that the barrel of the gun had already been drilled out when he purchased it years earlier. Defendant contends, therefore, that Agent Trochum's explanation of why the barrel had been drilled out went beyond the realm of his personal knowledge and entitles defendant to a new trial. Again, we disagree.

"[E]vidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case." *State v. Hannah*, 312 N.C. 286, 294, 322 S.E.2d 148, 154 (1984). The evidence at issue tended to show that defendant, in an effort to cover up the murder, had a motive to drill out the barrel of his .38-caliber pistol. This evidence is relevant and falls within the personal knowledge of Agent Trochum, a forensic firearms and tool marks examiner with the SBI. Again, defendant was free to challenge Agent Trochum's conclusions during cross-examination. This assignment of error is without merit.

[10] Defendant next contends the trial court erred in admitting the hearsay testimony of Reverend Vinella Evans and SBI Agent Kennedy.

In the first instance, Reverend Evans testified that shortly before the victim's death, defendant came to Evans' house where the victim worked as a practical nurse and talked with the victim outside the house. When she came inside, the victim was in tears and told Evans that defendant was the father of her child and that she feared for her life if she went to court in an effort to obtain child support from defendant. Defendant contends these statements were hearsay and failed to fall within a recognized exception to the exclusion.

Rule 803 of the North Carolina Rules of Evidence provides, in pertinent part, as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health).

N.C.G.S. § 8C-1, Rule 803(3) (1992). The scope of the conversation between the victim and Evans related directly to the victim's state of mind and emotional condition. "Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991). The victim's state of mind was relevant as it related directly to circumstances giving rise to a potential confrontation with defendant on the day she was murdered. The probative value of this evidence is not outweighed by unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992). This contention is without merit.

[11] In the second instance, Agent Kennedy testified that defendant had told him that defendant had given his .38-caliber pistol to a friend but that he would give it to Agent Kennedy the next day. When Agent Kennedy called defendant's residence the next day which was Saturday, 18 April 1992, defendant's wife told the officer her husband was at his father's home in Atkinson. Agent Kennedy left his pager number for defendant to call him when he returned. Later, when Agent Kennedy confronted defendant with the fact that he could have used his father's drill on that occasion to drill out the barrel of his gun, defendant denied he had been at his father's home. Defendant con-

tends the statement of defendant's wife, repeated by Agent Kennedy, is inadmissible hearsay.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard*, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). Here, the testimony was not offered to prove the truth of the matter asserted but rather to explain Agent Kennedy's actions after he was unable to retrieve the gun from defendant although defendant had promised to deliver the gun to the police that morning. *See State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56-57 (1990) (holding that statements of one person to another, offered to explain the subsequent conduct of the person to whom the statement was made, are admissible as nonhearsay). Defendant's wife's statement to Agent Kennedy was not hearsay for the purpose for which it was admitted. This entire assignment of error is overruled.

**[12]** Defendant next contends the trial court erred in allowing the State to cross-examine defendant with an irrelevant line of questions concerning different motivations a person may have for lying. Defendant argues the questions were used solely to elicit responses showing that defendant was unworthy of belief and to thus arouse the passions and prejudices of the jury.

During his cross-examination, defendant admitted that (i) he knew the victim believed him to be the father of her child; (ii) he knew she had successfully obtained court-ordered child support from the fathers of her other illegitimate children; (iii) his wife was aware of the rumor that he was the father of the victim's child; (iv) he told his wife he was not the father; and (v) he had lied to his wife on occasion, that "[e]verybody ha[s] a tendency to tell a lie to their wife," and that "it's just natural for a man to just tell a lie, I mean to his wife." The prosecutor then asked questions of defendant concerning whether or not people would lie rather than lose money or to protect loved ones.

As noted above, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). The

line of questioning challenged by defendant is relevant to show that defendant had a motive to lie and possibly to murder. By lying, defendant may have been able to avoid paying child support and protect his family from the embarrassment of his being publicly regarded as the father of the victim's child. *See State v. Meekins*, 326 N.C. 689, 700-01, 392 S.E.2d 346, 352 (1990) (holding that cross-examination of defendant concerning pending rape charge was relevant to prove that his motive for murder and robbery was to obtain the means to flee from pending charges). This assignment of error is without merit.

**[13]** Next, defendant contends the trial court erred in denying his motion to dismiss and motion for a directed verdict for lack of sufficient evidence. Defendant contends that, without defendant's illegally obtained inculpatory statement, not a scintilla of evidence existed to raise even a suspicion that defendant murdered the victim. Having previously determined that the trial court did not err in concluding that defendant's incriminating statements to police officers were not the product of custodial interrogation and were not involuntarily made, we disagree with defendant's contention.

The question before the trial court on defendant's motions was "whether, upon consideration of all of the evidence in the light most favorable to the State, there [was] substantial evidence that the crime charged in the bill of indictment was committed and that defendant was the perpetrator." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990). The trial court need not be concerned with the weight of the evidence; it need only satisfy itself that sufficient evidence exists to present the case to the jury. *Id.* Our *corpus delicti* rule is that

> there [be] some *evidence aliunde* the confession which, when considered with the confession, will tend to support a finding that the crime charged occurred. The rule does not require that the *evidence aliunde* the confession prove any element of the crime. The *corpus delicti* rule only requires *evidence aliunde* the confession which, when considered with the confession, supports the confession and permits a reasonable inference that the crime occurred.

*State v. Trexler*, 316 N.C. 528, 532, 342 S.E.2d 878, 880 (1986). Essentially, under our rule of *corpus delicti*, if there is corroborating evidence other than the inculpatory statements, the State's case is properly submitted to the jury. *Franklin*, 327 N.C. at 173, 393 S.E.2d at 788.

In the present case, viewed in the light most favorable to the State, testimony was offered by the State from numerous witnesses tending to show that the victim (i) accused defendant of fathering her child; (ii) intended to seek court-ordered child support from defendant; (iii) argued intensely with defendant several days before her death; (iv) admitted to her minister that she feared for her life; and (v) died as a result of a gunshot wound to her head, inflicted as she sat in her car. Further testimony disclosed that (i) the medical examiner removed a .38-caliber bullet from the victim's scalp; (ii) defendant twice denied owning a pistol, but police officers subsequently recovered a .38-caliber pistol from defendant; (iii) the barrel of defendant's gun had been drilled out; (iv) defendant owned a drill and drill bit and had access to his father's drill between the time of the murder and when his gun was taken by the police; and (v) defendant washed his hands with gasoline after agreeing to, but before submitting to, a gunshot residue test. This evidence, taken together with the confession, permits the inference that the victim was murdered and that defendant was the perpetrator.

The State presented sufficient testimony to carry the case to the jury on the charges of first-degree murder and discharging a firearm into an occupied vehicle. The trial court thus did not err in denying defendant's motion to dismiss and motion for directed verdict.

[14] Defendant next contends the trial court erred in refusing to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter. While conceding that this Court has held that a defendant is not entitled to have the jury consider a lesser offense when his sole defense is one of alibi, defendant asks this Court to modify its prior holdings. *State v. Annadale*, 329 N.C. 557, 566-68, 406 S.E.2d 837, 843-44 (1991); *State v. Warren*, 327 N.C. 364, 370, 395 S.E.2d 116, 120 (1990); *State v. Stevenson*, 327 N.C. 259, 262-63, 393 S.E.2d 527, 528-29 (1990); *State v. Shook*, 327 N.C. 74, 81, 393 S.E.2d 819, 823 (1990); *State v. Brewer*, 325 N.C. 550, 574-578, 386 S.E.2d 569, 583-85 (1989), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541 (1990). We decline to do so.

In our review of this Court's previous holdings, we find that where a defendant's sole defense is one of alibi, he is not entitled to have the jury consider a lesser offense on the theory that jurors may take bits and pieces of the State's evidence and bits and pieces of defendant's evidence and thus find him guilty of a lesser offense not positively supported by the evidence. In *State v.*

*Allen*, 297 N.C. 429, 255 S.E.2d 362 (1979), the defendant denied he was the victim's assailant and introduced evidence to support his defense of alibi and mistaken identity. This Court held that a defendant is not entitled to rely on the possibility that the jury may believe only a part of the State's evidence as a ground for submission of a lesser offense. In that circumstance, there is no positive evidence of a lesser offense and the jury need only decide whether defendant was the perpetrator of the crime charged.

*Brewer*, 325 N.C. at 576-77, 386 S.E.2d at 584.

Defendant's defense was an alibi established by the testimony of Bertha Nixon that indicated defendant had been at her home on the morning of the murder from 8:45 a.m. until 1:30 p.m. Defendant testified in his own defense that he did not make inculpatory statements to the investigating officers and that he did not kill the victim. Defendant cannot have it both ways. He cannot tell the jury that he was innocent of the crime because he was elsewhere when it occurred and that the inculpatory statements were not true and also demand to have the jury instructed on second-degree murder and manslaughter based on portions of his inculpatory statements which were favorable to him when taken out of context.

Since defendant limited himself to the defense that he was not in the vicinity of the shooting on the morning of 16 April 1992, the jury's decision was reduced to a factual determination of whether defendant was on Highway 210 near the Jesus Christ Worship Center Church and murdered the victim, as the State asserts, or was in Burgaw, North Carolina, mowing Mrs. Nixon's grass and was innocent of the murder, as defendant asserts. "Where the State's evidence is clear and positive as to each element of the offense charged and there is no evidence supporting a lesser offense, it is not error for a judge to refuse to provide instructions on that lesser charge." *Brewer*, 325 N.C. at 578, 386 S.E.2d at 585. We conclude that the trial court's instructions to the jury were proper as given and that the evidence did not warrant further instructions on second-degree murder and manslaughter.

[15] Finally, defendant contends the trial court erred in denying the jury's request to review the transcript during its deliberations. N.C.G.S. § 15A-1233(a) imposes two duties on the trial court when it receives a request from the jury to review testimony; the jurors must be present in the courtroom, and the court must exercise its discretion in determining whether to permit the requested evidence to be

read to or examined by the jury. *State v. Weddington,* 329 N.C. 202, 207, 404 S.E.2d 671, 675 (1991). The burden is on defendant to show that the court abused its discretion by acting so arbitrarily that the determination could not have been the result of a reasoned decision. *Weddington,* 329 N.C. at 209, 404 S.E.2d at 676.

During deliberations, the jury indicated it had a question and was returned to the courtroom. The following occurred:

JURY FOREMAN: We, the jury, would like to know if we could look over some of the evidence so we can clarify our decision.

THE COURT: What evidence is it you want to see?

JURY FOREMAN: It's several things, it's not all been in one particular thing.

THE COURT: I can't help you until you tell me what it is.

JURY FOREMAN: It's not necessarily the pictures. I guess one at a time we can say. Each person is disagreeing on some things. Can we see a transcript?

THE COURT: I see what you're saying. All right, have a seat. It is the request for a transcript of the testimony of the witnesses I would deny that to you. The reason being is unless we had a transcript of the witnesses for you . . . to read, it wouldn't be fair to, say, take part of the state's witnesses and part of the defense witnesses and not give it all to you, and all of you, all 12 of you together, have heard all of the evidence in this case. As I stated to you, your job is to weed through this evidence, assign weight to it and also to determine from your joint and collective recollections of the evidence, determine what the facts are. You deliberate with a view to reaching a verdict if it can be done without the surrender of an honest conviction, and that's what we're asking you to do, as best you can, to remember all the evidence and from that evidence determine what the facts are and render a verdict based upon your deliberations and the law as I have given it to you. I will not give you a transcript of any one witness, and I don't have the wherewithal or the facilities to give you a transcript of this entire trial. Now, do you have a question?

The jury's request was, at best, ambiguous. At no point did the jury foreman specify what clarifications they desired, what questions they had, or which pieces of evidence they wished to review. When the foreman finally asked to review the transcript in general, the

**HOLLOWAY v. WACHOVIA BANK AND TRUST CO.**

[339 N.C. 338 (1994)]

court explained it would not be fair to give the jury only portions of the testimony taken out of context of the whole trial. In instructing the jury to rely upon their individual recollections to arrive at a verdict, the trial court exercised its discretion and complied with the requirements of N.C.G.S. § 15A-1233(a). *See State v. Eason,* 328 N.C. 409, 431, 402 S.E.2d 809, 821 (1991) (holding that the trial court did not abuse its discretion by denying jury's request to review testimony because it did not want to give undue emphasis to the testimony of any particular witness); *State v. Lewis,* 321 N.C. 42, 51, 361 S.E.2d 728, 734 (1987) (holding that the trial court did not abuse its discretion by denying jury's request when it stated, "I just don't think that's the way to do things"). Similarly, we conclude that the trial court did not abuse its discretion in denying the jury's request in this case.

For the foregoing reasons, we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.